OPINION
{¶ 1} Julie Ann Abner appeals from her conviction and sentence on charges of aggravated murder, attempted aggravated murder, and aggravated arson.
 {¶ 2} Abner advances six assignments of error on appeal. First, she contends the trial court erred in overruling a motion to suppress incriminating statements obtained in violation of her constitutional rights. Second, she claims the trial court erred in excluding expert testimony that would have cast doubt on the reliability of her confession. Third, she asserts that the trial court erred in excluding testimony from witnesses who heard her son confess to starting a fire that killed his sister. Fourth, she argues that the trial court erred when it made evidentiary rulings excluding evidence favorable to her and admitting unduly prejudicial evidence presented by the prosecution. Fifth, she maintains that she received ineffective assistance of trial counsel. Sixth, she claims her convictions are based on legally insufficient evidence and are against the manifest weight of the evidence.
 I. Factual Background {¶ 3} The present appeal stems from a fire in an upstairs apartment that Abner shared with her two children, five-year-old William and two-year-old Ashleigh. At approximately 2:00 p.m. on August 28, 2002, Abner ran downstairs from the apartment, screaming that it was on fire with Ashleigh inside. A customer in a bar below the apartment, Ewing Hill, grabbed a fire extinguisher and rushed to the top of the stairs leading to the apartment. Because of the density of the smoke emanating from the apartment, Hill could go no further.
 {¶ 4} The Miamisburg Fire Department arrived on the scene, but firefighters initially were unable to enter the apartment because of the fire's intensity. After fighting the fire for some time, however, they were able to enter the apartment where they discovered Ashleigh's charred remains.
 {¶ 5} Miamisburg detective Rodney Stanley arrived on the scene at 2:40 p.m. and met Abner, who was at the back of the building in an ambulance. Abner agreed to speak with him and stated that her son, William, had set fire to a mattress in the bedroom. Stanley met Abner again later that day at Sycamore Hospital, where she still asserted that William had set the fire on the bed.
 {¶ 6} During the next three days, lieutenant Mark Shockman of the Miamisburg Fire Department examined the apartment extensively to determine the fire's origin and cause. Shockman observed that the heaviest fire damage was in the living room. Although the bedroom also had sustained some damage, the walls, ceiling, and furniture there were relatively intact. Shockman also noted that there was padding within the mattress, and the floor underneath the bed was not burned at all. The living room walls and ceiling, however, were completely consumed, and the furniture in that room showed significant fire damage. The heaviest damage was to the furniture in the northeast quadrant of the room, particularly in the area between the couch and the coffee table. The damage suggested to Shockman that the furniture had been attacked locally at floor level and that the fire did not fan out in equal directions across the ceiling and come down the walls, as a fire normally would do. There also were what appeared to be irregular burn patterns on the floor between the couch and coffee table, suggesting to Shockman that an ignitable liquid had been poured on the floor.
 {¶ 7} Based on his observations, Shockman requested an accelerant-detection canine to respond to the scene. Dennis Cummings from the Ohio Fire Marshall's office and his dog, Harvey, arrived the next day. Harvey alerted to five areas where he detected the presence of an ignitable liquid. Three of the alerts occurred between the couch and the coffee table. Later laboratory testing, however, failed to confirm the presence of an accelerant in any of the areas where Harvey had alerted. Nevertheless, based on his observations, Shockman concluded that the fire did not start in the bedroom on the mattress, as Abner had claimed. Rather, he concluded that the fire had been set in the living room between the couch and the coffee table by pouring an ignitable liquid on the floor in that area. Ohio Fire Marshals Michael McCarroll and Dennis Cummings, who conducted independent examinations of the scene, essentially concurred in Shockman's conclusion.
 {¶ 8} On the night of August 29, 2002, as Shockman and Stanley were leaving the apartment, an elderly woman from the neighborhood approached and told them she had found a gas can behind her apartment. The woman, Shirley Hill, led them to her nearby apartment, where they observed a red, plastic gas can and a red Bic disposable lighter.
 {¶ 9} Stanley subsequently contacted Abner a third time on September 9, 2002, at approximately 1:00 p.m. He and his partner, detective Jeff Crumbley, asked her to accompany them to the Miamisburg Police Department to talk about the fire. She agreed, and they drove her there. Upon their arrival, Stanley told Abner she was under no obligation to speak to them, she was not under arrest, and she was free to leave any time. Abner agreed to stay and sat at a table with the two detectives and Shockman, who had joined them. During the interview, she gave various versions of how the fire started. After about ninety minutes, Abner asked to see her mother, Tina Robinson, who was brought to the police station. Robinson told her daughter "to quit feeling sorry for herself and tell the truth." Stanley told Abner her story did not make sense and he thought she was lying. Stanley and Shockman showed Abner photographs of the fire scene in an effort to show her the fire could not have started as she claimed it did. According to Stanley, Abner eventually blurted out, "I started the fire."
 {¶ 10} Stanley then read Abner her Miranda rights and asked if she understood them. He also asked Abner if she had any questions about the warnings, and Abner asked whether they meant "that somebody is getting me an attorney?" Stanley said he told Abner that if she could not afford a lawyer, the public defender's office would provide an attorney for her. Stanley also said he explained to Abner that she could stop answering questions until she talked with a lawyer. Abner said she understood, and she agreed to waive her rights and speak further with the police. Abner then told him she could write but had trouble reading. As a result, she provided a taped confession, which was admitted at trial.
 {¶ 11} In her confession, Abner told the officers that she had been upset due to a phone conversation with her husband in Florida shortly before she set the fire. She stated that her husband "didn't care anything about her[,] [d]idn't care anything about the kids[,] [e]ssentially left them on their own to survive however they could." During their conversation, he had called her an unfit mother and a "fucking retard." She was angry and lit the fire on the floor of the living room with the purpose of killing herself and her two children. Abner stated, "I wanted to kill us all." She told the officers she had retrieved a red gas can from the back stairwell, where the owner of the building kept maintenance equipment, poured gasoline in a couple of spots on the carpet between the couch and the coffee table, and lit it with a lighter while Ashleigh and William were watching television. William ran down the stairs when he saw her light the fire. Ashleigh remained in the apartment, and Abner left her there when she ran downstairs to notify her mother about the fire.
 {¶ 12} For her part, Abner relied largely on expert testimony from fire investigator William Tenney. Based on his review of photographs and reports prepared by the other investigators, Tenney opined that the fire likely had started in the bedroom. He also questioned whether burn marks on the living room floor had been caused by an accelerant. In Tenney's view, the fire probably had started in the bedroom and had flowed quickly into the living room, where it grew in intensity.
 {¶ 13} Following a lengthy trial, a jury convicted Abner of the charges against her. The trial court sentenced her to an aggregate term of twenty years to life in prison. This timely appeal followed.
 II. Analysis {¶ 14} In her first assignment of error, Abner contends the trial court erred in overruling a pretrial motion to suppress her two confessions to police on September 9, 2002. She advances four arguments in support. First, she insists that she was in custody and should have been advised of her Miranda rights immediately upon her arrival in the interview room. Second, she claims the officers who questioned her attempted an impermissible end-run around Miranda by employing a "question-first-warn-later" technique that was condemned in Missouri v. Seibert (2004),542 U.S. 600. Third, she asserts that she did not knowingly, intelligently, and voluntarily waive her Miranda rights after her first, untaped confession and prior to her second, taped confession. Fourth, she maintains that her confessions were involuntary.
 {¶ 15} Upon review, we find Abner's arguments to be unpersuasive. Statements given by a suspect who appears at the police station on request for questioning, but who is advised that she is not under arrest and is free to leave, are not the product of custodial interrogation and are admissible absentMiranda warnings. Oregon v. Mathiason (1977), 429 U.S. 492. Although the circumstances of each case influence a determination of whether a suspect is "in custody" for Miranda purposes, the ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. California v. Beheler (1983), 463 U.S. 1121.
 {¶ 16} In the present case, we agree with the trial court that Abner was not in custody, for Miranda purposes, until she first confessed to starting the fire. She was not under restraint during the interrogation to the degree associated with an arrest. She had been advised that she was free to leave, and there were no restrictions on her movement. A reasonable person in Abner's position would not have believed she was in custody. Therefore, the absence of Miranda warnings did not render the initial confession, or any statements preceding it, inadmissible.
 {¶ 17} We also reject Abner's argument that police used an impermissible question-first-warn-later technique. This argument implicates Seibert, supra, in which police purposefully withheld Miranda warnings during a custodial interrogation until after the suspect had confessed. Once they obtained a confession, police took a short break after which they advised the suspect of her Miranda rights and obtained a waiver. They then obtained a second confession by confronting the suspect with her prior, unwarned confession. Upon review, the Seibert Court held that the second confession was inadmissible. In so doing, the majority concluded that the Miranda warnings were ineffective because a person in the suspect's position would not have understood them to mean that she had any real choice about talking. Id. at 617.
 {¶ 18} The present case is readily distinguishable fromSeibert. Unlike the suspect in that case, Abner was not in custody when she gave her first confession. Therefore, police had no duty to advise her of her Miranda rights prior to that confession. Thus, unlike the situation in Seibert, police did not thwart Miranda when they subsequently advised Abner of her rights and obtained a waiver before she confessed a second time. See State v. Winterbotham, Greene App. No. 05CA100,2006-Ohio-3989, ¶ 25 (finding Seibert inapplicable because the defendant was not in custody when he first confessed).
 {¶ 19} We next find no merit in Abner's argument that she did not knowingly, intelligently, and voluntarily waive her Miranda
rights prior to her second confession. In support of this claim, Abner contends her low intelligence rendered her incapable of comprehending her rights. She also asserts that the police interrogation was "incredibly coercive and confrontational[.]"
 {¶ 20} We disagree. "To be knowing, intelligent and voluntary, the relinquishment of [Miranda] rights must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception, and the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." State v. Brown,
Montgomery App. No. 19113, 2002-Ohio-6370, ¶ 11. Although Abner argues that her low intelligence precluded a valid waiver of herMiranda rights, "low intellectual capacity, standing alone, does not demonstrate that [a] defendant lacks the ability to comprehend and validly waive [her] Miranda rights." Id. at ¶ 17. Rather, the totality of the facts and circumstances must be considered. Id.
 {¶ 21} In the present case, detective Stanley testified that Abner indicated an understanding of each right after requesting and receiving clarification about her right to an attorney. Abner also placed her initials on a form next to each right and signed a waiver. Nothing in the record indicates that she did not comprehend her rights or the consequences of a waiver. In a subsequent interview for purposes of assessing Abner's competence to waive her Miranda rights, psychologist Kim Stookey asked Abner what each of the rights meant. Abner's responses demonstrated her comprehension of them. Moreover, we do not agree that Abner's waiver was the product of any police intimidation or coercion. The record does not support such a claim. To the contrary, the facts and circumstances persuade us that Abner knowingly, intelligently, and voluntarily waived her rights.
 {¶ 22} Finally, we reject Abner's argument that her statements to police were involuntary under the Due Process Clause because her will was overborne by coercive police activity. In support, she asserts that her "limited emotional makeup was subjected to confrontational interrogation methods for over three and a half hours." She also notes that her mother described her as "scared" and that her IQ places her in the bottom few percent of the population. In addition, she claims police used coercive tactics by telling her how they thought the fire started and by informing her that her version was not consistent.
 {¶ 23} "A suspect's decision to waive his Fifth Amendment privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. Coercive police activity is a necessary predicate to finding a confession involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment." State v. Waldo,
Champaign App. No. 99CA24, 2001-Ohio-1349 (citations omitted).
 {¶ 24} We find no coercive police activity here. Although Abner's interview was relatively long, she was not in custody prior to her first confession and could have left any time. She also took breaks whenever she desired and spoke freely with her mother. Nothing in the record indicates that police unfairly exploited Abner's low intelligence, made any threats or promises, or deprived her of anything. Police did tell Abner that her denials made little sense and that they thought she was guilty. But these statements, which were based on crime-scene evidence that contradicted Abner's version of events, were not unduly coercive. We note too that she ultimately confessed in response to urging by her mother, who was present at Abner's request, to tell the truth. Despite Abner's low intelligence, we are firmly convinced that her confession was voluntary under the Due Process Clause. Her first assignment of error is overruled.
 {¶ 25} In her second assignment of error, Abner claims the trial court erred in excluding expert testimony that would have cast doubt on the reliability of her confession. This assignment of error concerns psychologist Michael Williams, a defense expert who proffered testimony about false confessions. Abner sought to call Williams to testify about psychological reasons why suspects sometimes give false confessions. She also sought to have Williams testify about "task analysis," a process that involves breaking a particular activity down into its component steps. Abner contends Williams' testimony would have helped the jury assess whether her confession was false and whether she had the capacity to carry out the number of steps necessary to start the fire.
 {¶ 26} In State v. Stringham, Miami App. No. 2002-CA-9, 2003-Ohio-1100, we recognized the general admissibility of expert testimony that bears on the believability of a defendant's confession. In particular, we held that an expert witness could testify about psychological reasons why a person might confess to a crime he did not commit. We added a caveat, however, noting that such testimony would be admissible if it were proven to be sufficiently reliable under Evid.R. 702.
 {¶ 27} After hearing Williams' proffered testimony in the present case, the trial court acknowledged that it "bears on the reliability and credibility of Defendant's confession[.]" (Doc. #207 at 4).The trial court nevertheless excluded the testimony. In so doing, the trial court found that Abner had not sufficiently established the reliability of Williams' opinions under Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993),509 U.S. 579 and Evid.R. 702(C). With regard to Daubert, the trial court reasoned as follows:
 {¶ 28} "Upon reviewing Dr. Williams' testimony in light of the Daubert factors, the Court finds that Defendant has failed to adequately establish the reliability of Dr. Williams' expert testimony. With respect to false confessions, Dr. Williams testified that the issue has been subjected to peer review and publication and that the theory that certain persons are susceptible to making false confessions has been generally accepted by psychologists. He also testified that he used standardized testing techniques when testing Defendant. There was no testimony, however, about the extent to which the theory that certain character traits make a person susceptible to a false confession has been actually tested. Furthermore, Dr. Williams' testimony did not go to what the specific traits are or how Defendant's specific character or personality traits are consistent with the current literature and studies. Dr. Williams also testified that `it is very difficult to determine what the accura[cy] or exact rate of error would be.' The rate of error is difficult to determine because whether a subject falsely confessed cannot be determined until he or she is cleared of the crime through some other technology.
 {¶ 29} "Dr. Williams also provided testimony related to Defendant's ability to perform multi-step tasks. Defendant did not establish a foundation, however, for the reliability of this testimony under Daubert. Accordingly, the Court finds that the State has raised a valid objection to Dr. Williams' testimony." (Doc. # 207 at 5).
 {¶ 30} Similarly, the trial court concluded that Abner had not demonstrated the reliability of Williams' proposed testimony under Evid.R. 702(C). In support, the trial court reasoned as follows:
 {¶ 31} "Dr. Williams' testimony did not provide the foundation adequate for the Court to find his testimony reliable. Although he testified as to the general acceptance of the body of learning on false confessions, he did not testify as to the knowledge, facts, or principles from which it is derived. For example, he did not testify as to the factors set forth in the current literature and studies that cause a person to be susceptible to suggestion and making false confessions. Furthermore, he did not testify as to the design of the procedure implementing the theory of false confessions or the probability of yielding an accurate result. Rather, he stated that the rate of error on false confession studies was difficult to determine. Likewise, Dr. Williams' testimony on Defendant's ability to perform multi-function tasks did not provide the Court with sufficient detail to find that it was reliable evidence under Ohio Evid.R. 702(C)." (Id. at 6).
 {¶ 32} On appeal, Abner argues that the trial court erred in applying Daubert factors applicable to "scientific" experts to the proposed testimony of Williams, a psychologist. In response, the State argues that the trial court applied the proper factors. The State also argues that Abner's distinction between scientific and non-scientific experts is wrong because Daubert applies to all expert testimony.
 {¶ 33} Upon review, we find no abuse of discretion in the trial court's exclusion of Williams' testimony. In Daubert, the Court recognized a trial court's important "gatekeeping function" to ensure that evidence is reliable. Daubert, supra, at 589. The Daubert Court then identified a non-exclusive list of factors for courts to consider when deciding whether proposed scientific expert testimony is sufficiently "reliable." These factors include: (1) "whether a theory or technique * * * can be and has been tested"; (2) "whether the theory or technique has been subjected to peer review or publication"; (3) "the known or potential rate of error"; and (4) "general acceptance." Id. at 593-594.
 {¶ 34} In Kumho Tire Co., Ltd. v. Carmichael (1999),526 U.S. 137, the Court clarified the applicability of the foregoing factors to non-scientific evidence. Therein, the Court reaffirmed that a trial court's gatekeeping function applies to all expert testimony, regardless of whether the testimony is based on scientific, technical or other specialized knowledge. Kumho,
supra, at 147-149. The Kumho Court noted, however, that the specific factors enumerated in Daubert will not always apply. In some cases, those factors may be pertinent, whereas in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." Id. at 150.
 {¶ 35} When conducting its analysis in the present case, the trial court noted the absence of testimony from Williams "about the extent to which the theory that certain character traits make a person susceptible to a false confession has been actually tested." The trial court also found that Williams had failed to testify about "what the specific traits are or how Defendant's specific character or personality traits are consistent with the current literature and studies." Finally, the trial court was troubled by Williams' inability to determine an error rate for false confessions.
 {¶ 36} Upon review, we believe the trial court acted within its discretion in considering Daubert's reliability factors despite the fact that Williams was not a scientist providing strictly "scientific" evidence. As the Kumho Court recognized, to some extent the specific Daubert factors may be relevant to an assessment of the reliability of all types of expert testimony. Therefore, the trial court did not abuse its discretion in including those factors in its analysis.
 {¶ 37} More importantly, we find no abuse of discretion in the trial court's ultimate conclusion that Abner failed to establish the reliability of Williams' proffered testimony. With regard to false confessions, Williams testified that certain characteristics tend to make a person susceptible to giving false confessions. (Trial transcript at 687). Based on his examination of Abner, he then expressed his belief that she is susceptible to giving a false confession. (Id. at 688). Williams also opined that Abner's confession in this case was not reliable, and he gave reasons for that conclusion, including her acquiescent personality and her desire to please others.
 {¶ 38} As the trial court correctly noted, however, Williams provided little specific foundational testimony about the study of false confessions. Although Williams testified that certain characteristics make a person prone to giving false confessions, he identified few, if any, of those characteristics. He also failed to explain how psychologists have determined that certain traits or characteristics correlate with false confessions. Nor did he identify the relative strength of this professed correlation between certain traits or characteristics and false confessions. Notably, Williams provided little support for his claim that Abner herself was prone to giving a false confessions.[1] His testimony with respect to false confessions was largely conclusory. For the foregoing reasons, we conclude that the trial court did not abuse its discretion in excluding Williams' false-confession testimony under Daubert
and Evid.R. 702(C), both of which require a showing that the proposed testimony is based on reliable information.
 {¶ 39} We reach the same conclusion with regard to Williams' proffered testimony about "task analysis." On this issue, Williams stated little more than that Abner lacked the ability to perform tasks involving more than three or four steps. The trial court found that Williams failed to provide sufficient details to establish the reliability of his opinion on the issue. Based on our review of the record, we cannot say the trial court abused its discretion in reaching this conclusion.
 {¶ 40} Abner next argues that the exclusion of Williams' testimony deprived her of a meaningful opportunity to present a complete defense. In support, she cites Rock v. Arkansas
(1987), 483 U.S. 44, and Crane v. Kentucky (1986),476 U.S. 683. Neither case, however, supports the proposition that the trial court was required to admit Williams' testimony. In Rock,
the U.S. Supreme Court struck down Arkansas' per se rule barring all hypnotically refreshed testimony. The Court reasoned that the State's legitimate interest in barring unreliable evidence does not justify a per se exclusion because such evidence may be proven reliable in an individual case. In Crane, the U.S. Supreme Court recognized that a defendant should be permitted to introduce "competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." Crane, 476 U.S. at 690.
 {¶ 41} Unlike Rock, the trial court in the present case did not exclude Williams' testimony based on a per se rule that testimony about false confessions is inadmissible. Rather, the trial court found that Abner failed to establish the reliability of the testimony and excluded it on that basis. Similarly,Crane addresses the admissibility of "reliable evidence," but the trial court here found insufficient evidence of reliability under Daubert and Evid.R. 702(C). Therefore, the exclusion of Williams' testimony violates neither Rock nor Crane.
 {¶ 42} In a final argument, Abner asserts that her attorney's failure to establish the reliability of Williams' testimony underDaubert and Evid.R. 702(C) constitutes ineffective assistance of counsel under Strickland v. Washington (1984), 466 U.S. 668, which requires a showing of deficient performance and resulting prejudice. Based on the appellate record, however, Abner cannot show deficient performance by her trial counsel. Indeed, it is impossible to determine from the record before us whether her attorney reasonably could have established the reliability of Williams' testimony. Without knowing whether Williams' false-confession testimony actually was reliable, we cannot say Abner's counsel provided constitutionally ineffective assistance by failing to prove it to be so. Abner's second assignment of error is overruled.
 {¶ 43} In her third assignment of error, Abner asserts that the trial court erred in excluding testimony from two witnesses who heard her son confess to starting a fire that killed his sister.
 {¶ 44} This argument concerns proffered testimony from an individual named Eddie Davis, who allegedly overheard Abner's five-year-old son, William, say, "I start fire. Kill baby sister." Abner asserts that the statement overheard by Davis was admissible as an excited utterance under Evid.R. 803(2). She also argues that the trial court erred in excluding an incriminating statement William made to Miamisburg detective Rodney Stanley about having started the fire. Abner argues that this statement was admissible as a statement against interest under Evid.R. 804(B)(3).
 {¶ 45} As a means of analysis, we turn first to the statement William made to Detective Stanley. The record reflects that Stanley met William outside of a nearby restaurant several hours after the fire. William was not crying at the time, and he appeared to be "normal." While playing with William's toys, Stanley began asking him about the fire. For the most part, William responded with unintelligible "gibberish." However, Stanley did hear the child repeatedly say the word "dead." Stanley detected no change in William's emotions or facial expressions as he spoke. Eventually, Stanley asked William if he had started the fire. William alternatively shook his head affirmatively while saying "no" and shook his head negatively while saying "yes." Stanley then questioned William about how the fire had started. Although the detective only understood some of the boy's response, Stanley heard him say "red lighter" and "[c]an't get fire out." (Trial transcript at 1550, 1557). Because Abner previously had advised Stanley that William started the fire, the detective "put together from what [William] was saying * * * that he had used [a] red lighter and couldn't get the fire to go out." (Id. at 1557). William did not specifically tell Stanley that he had started the fire. (Id. at 1564-1565). The detective made that assumption based on what Abner had told him. (Id.).
 {¶ 46} Based on the foregoing testimony, which the trial court heard outside the presence of the jury, Abner argued that William's statements to Detective Stanley qualified as excited utterances under Evid.R. 803(2). (Id. at 1518-1519). The trial court rejected this argument, finding that William was no longer under "the stress of excitement" caused by the fire when he spoke to Stanley. Therefore, the trial court held that William's statements to the detective were not admissible.
 {¶ 47} On appeal, Abner concedes that William's responses to Stanley "could possibly [be] considered reflective thought, and thus not excited utterances." She argues, however, that they qualify as statements against interest under Evid.R. 804(B)(3). In response, the State notes that Abner did not raise this issue in the trial court and, therefore, has waived all but plain error.
 {¶ 48} Upon review, we find no error in the trial court's conclusion that William's statements did not qualify as excited utterances. The record fully supports the trial court's determination that William no longer was under the stress of excitement caused by the fire when he spoke to Detective Stanley. We also agree with the State's argument that Abner waived all but plain error with regard to admissibility under Evid.R. 804(B)(3) because she did not raise that issue at trial. Moreover, we find no plain error in the trial court's failure to admit William's statements under Evid.R. 804(B)(3), which provides:
 {¶ 49} "(3) Statement against interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
 {¶ 50} We seriously doubt whether five-year-old William had any understanding of concepts such as pecuniary interest, proprietary interest, or criminal liability. Nothing in Detective Stanley's testimony would support such a conclusion. Absent a declarant's understanding that making certain statements is against his own interest, however, the rationale for admitting them under Evid.R. 804(B)(3) does not exist. See State v. Ross,
Franklin App. No. 02AP-898, 2003-Ohio-3338, ¶ 52 ("[T]he record does not demonstrate that Joel, as a five-or-six-year-old, was developed mentally to the point that he could appreciate such concepts as pecuniary interest, proprietary interest, or criminal liability. Since he could not comprehend these concepts, he could not speak about them in a way that would only be true because he had to know he was placing his money or freedom at risk."). We note too that William's statements to Stanley were ambiguous and not necessarily against the child's penal or other interests. As a result, we find no plain error in the failure to admit the statements under Evid.R. 804(B)(3).
 {¶ 51} Abner also argues, in conclusory fashion, that the exclusion of William's statements to Detective Stanley violates the "due process, compulsory process and/or the confrontation clauses of the Fifth and Sixth Amendments to the United States Constitution." Abner failed to make this argument to the trial court and, once again, has waived all but plain error. Absent any specific argument from Abner, and based on our review of William's statements to Stanley, we find no plain error here.
 {¶ 52} The sole remaining issue under Abner's third assignment of error is whether the trial court abused its discretion in excluding the proffered testimony of Eddie Davis. The record reflects that Davis knew Abner's mother, Tina, through her work as a bartender. Davis stated that he also knew Abner "through Tina." Davis testified that he was driving near the apartment at the time of the fire and saw smoke. As a result, he went to the scene "to see what was going on." Shortly after his arrival, Davis saw an individual name Jamon Caudill carrying Abner's son, William, up the sidewalk away from the fire and toward a pizza restaurant. According to Davis, William was crying and appeared to be upset. Davis testified that as he passed the child, he heard William repeat several times, "I start fire. Kill baby sister." (Trial transcript at 1960).
 {¶ 53} After considering argument from counsel, the trial court concluded that the statement allegedly overheard by Davis did not qualify for admission as an excited utterance under Evid.R. 803(3). In reaching this conclusion, the trial court reasoned as follows in a ruling from the bench:
 {¶ 54} "Okay. We're looking at Evidence Rule 803.2 excited utterances. The things to be considered are the lapse of time between the event and declaration. And I have mentioned before with children, time is not significant. In any event, this would be close in time.
 {¶ 55} "The second, mental and physical condition of the declarant. In this case, a concern is not so much mental and physical condition but the ability of the child to relate.
 {¶ 56} "Detective Stanley said that when he spoke to the child a number of hours later, it is very hard to understand him. Didn't really speak in sentences. Would say yes and shake his head no. Saying no, and then shaking his head yes.
 {¶ 57} "This was corroborated by Clarence Grushon who said he could understand very little that William said.
 {¶ 58} "And also, although it was proffered, Mr. Caudill, who said he was hard to understand.
 {¶ 59} "So, while — so while the problem goes not to mental age, per se, but the child's special impediment that made it very difficult for anyone to understand what he was saying.
 {¶ 60} "The third factor is [to] consider the nature of the statement.
 {¶ 61} "Now, when this first came up, with a lot of discussions, both on and off the record, it was my understanding that the statement of Mr. Davis was: [`]I killed my sissy,['] or something in the nature of [`]I killed my sister.[']
 {¶ 62} "And at that time, and I asked if that was all. And it was my recollection that I was told that was all. Because at that time that statement itself, I killed my sister, I told all counsel that I believe before we even got to excited utterance, it was hearsay on hearsay, based upon the evidence. And I think there's no dispute that that little boy never really saw Ashleigh dead and burned the way she was when she was taken out. She was taken out in a body bag.
 {¶ 63} "So, that part of the statement, [`]I killed my baby sister,['] is not from his own perception. It can't be.
 {¶ 64} "So, that would be out of this nature.
 {¶ 65} "A fourth thing to consider according to the staff notes, it's influence of intervening circumstances. Looking at the whole statement: [`]I started the fire and killed my baby sister.['] First of all, I think it all goes together and as part of one statement, that is hearsay within hearsay. In other words, excited or not, there are things there that the child heard from someone else. And, therefore, that part would be out.
 {¶ 66} "Additionally, Ms. Gilbert testified, consistent with the proffer of Mr. Caudill, that she plucked him out of the midst of ten people who were talking about the fire, who started it, and the like. Therefore, again, there's a strong probability, if not certainty of hearsay, when people are talking about the fire.
 {¶ 67} "I believe defense counsel said you don't really know what anyone said. But what we know is that ten people are talking about the fire, and who started it. And there's a little boy standing in the middle of it, who could (sic) have known by personal experience that his sister was dead. So, both for the fact that there are intervening circumstances that make it more likely than not that the child was parroting something, the nature of this statement or at least a portion of this statement is of its nature hearsay.
 {¶ 68} "And the condition of the child is such that his speech was hard to understand. And in the situation of talking with the detective, didn't really make any sense. Saying one thing and signifying with the other. For all of those reasons, I do not find it comes within the excited utterance exception to hearsay that would make it reliable." (Trial transcript at 1969-1972).
 {¶ 69} The trial court's ruling implicates Evid.R. 803(2), which provides that an "excited utterance" is not excluded by the hearsay rule. An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event. State v. Taylor
(1993), 66 Ohio St.3d 295, 300-301.
 {¶ 70} We review a trial court's ruling on the admissibility of an alleged excited utterance for an abuse of discretion.State v. Henley, Montgomery App. No. 20789, 2005-Ohio-6142. In conducting our review, we may not disturb a trial court's rejection of a declaration as an excited utterance if its decision is reasonable. In Taylor, the Ohio Supreme Court elaborated on the scope of our review as follows:
 {¶ 71} "`There may be instances in which a decision to reject such a declaration will appear to a reviewing court almost as reasonable as a decision to admit it; and vice versa. We certainly do not believe that the decision of the trial judge in such an instance should be disturbed.
 {¶ 72} "`* * * [T]he trial judge, in determining whether this declaration was admissible, necessarily had to decide certain questions of fact. If his decision of those questions of fact, as reflected in his ruling on the admissibility of this declaration, was a reasonable decision, an appellate court should not disturb it. In other words, we believe that the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule, should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision. * * *'"Taylor, 66 Ohio St.3d at 304-305, quoting Potter v. Baker
(1955), 162 Ohio St. 488, 499-500.
 {¶ 73} Having reviewed the record, we conclude that the trial court did not act reasonably, and abused its discretion, in finding William's alleged statement inadmissible as an excited utterance. With regard to the four prerequisites for admissibility, first, the apartment fire undoubtedly qualified as an event startling enough to produce nervous excitement in William. The State does not argue otherwise.
 {¶ 74} Second, the record compels a conclusion that William remained under the stress of excitement caused by the fire when he made the statement overheard by Eddie Davis. Shortly before making the statement, William was observed standing at the window of a nearby building watching the fire in progress. According to witness Angie Gilbert, he was "in a daze, like, just staring outside." (Trial transcript at 1929). Likewise, Jamon Caudill, who actually carried William from the nearby building, testified that William was "excited because he had been sitting and standing in the front window watching the fire trucks and stuff." (Id. at 1764). In addition, Abner's mother, Tina Robinson, testified that she saw William standing at the window of the nearby building, "looking at the fire and * * * crying." (Id. at 1889). In light of the foregoing testimony, the nature of the fire, William's young age, and the minimal passage of time between the onset of the fire and William's statement, we harbor no doubt that he remained under the stress of excitement caused by the fire. The trial court does not appear to have found otherwise.
 {¶ 75} Third, the statement at issue plainly related to the startling event. William allegedly stated that he started the fire and killed his sister. Therefore, the third prerequisite for admission as an excited utterance is satisfied.
 {¶ 76} The final requirement for admissibility is the declarant's personal observation of the startling event. On this issue, the trial court found that William had no personal knowledge of having killed his sister because he never saw her "dead and burned." The trial court reasoned that someone must have told him he killed his sister. As a result, the trial court concluded that at least this portion of William's statement did not qualify as an excited utterance. Under the circumstances, however, we believe William reasonably may have inferred that he killed his sister if, in fact, he started the fire. Indeed, it is undisputed that whoever started the fire killed Ashleigh Abner. But even setting this issue aside, and assuming that his statement about having killed his sister was inadmissible, there is no doubt that William personally observed the fire and had first-hand knowledge about whether or not he started it. Therefore, at a minimum, his alleged statement, "I start fire," satisfied the fourth prerequisite for an excited utterance.
 {¶ 77} In concluding that no portion of William's statement qualified as an excited utterance, the trial court first expressed concern about "the ability of the child to relate" what had happened. In particular, the trial court noted that Detective Rodney Stanley had experienced difficulty understanding William several hours later. The trial court also pointed out other witnesses had expressed an inability to understand much of what William said to them. As a result, the trial court found the presence of some "impediment that made it very difficult for anyone to understand what he was saying." Notably, however, Eddie Davis did not profess to have any difficulty in understanding William's statement, "I start fire. Kill baby sister." The fact that other witnesses may have been unable to understand much of what William said does not make the apparently clear and unambiguous statement overheard by Davis inadmissible. At most, the experiences these other witnesses had trying to understand William might call into question Davis' veracity and affect the weight a jury affords his testimony.
 {¶ 78} The trial court next expressed concern about "the nature of the statement." Specifically, the trial court found that the portion of William's statement about killing his sister necessarily was "hearsay on hearsay" because he lacked first-hand knowledge that he had killed Ashleigh. Nevertheless, the critical portion of William's statement is that he started the fire, not that he killed his sister. This is so because whoever started the fire indisputably killed Ashleigh. As noted above, the trial court's "hearsay on hearsay" concern has no applicability to William's statement that he started the fire. Therefore, we see no justification for not admitting at least that part of his statement as an excited utterance.
 {¶ 79} Finally, the trial court expressed concern about the "influence of intervening circumstances" on William's statement. In particular, the trial court observed that, shortly before making the statement, William had been in a nearby building where people were talking about the raging fire. The trial court noted that Angela Gilbert and Jamon Caudill had "plucked him out of the midst of ten people who were talking about the fire, who started it, and the like." Based on the fact that William had been standing near these people, the trial court found it more likely than not that "the child was parroting something" someone else had said when he made the statement allegedly overheard by Eddie Davis.
 {¶ 80} Having reviewed the record, however, we find that the evidence does not support the trial court's conclusion about William most likely "parroting" something he overheard. The only testimony on this issue came from Angela Gilbert,[2] who testified as follows about seeing William in the nearby building shortly before Caudill carried him away:
 {¶ 81} "Q: Did you see your sister?
 {¶ 82} "A: Not at that time. * * * And when I seen William in the mission, we went in and got my great nephew out of the mission. We were standing in front of the window that was right beside the fire.
 {¶ 83} "Q: He was actually in, like, a store front?
 {¶ 84} "A: He was in the window.
 {¶ 85} "Q: Was he by himself?
 {¶ 86} "A: The[re] was like, oh, man, I couldn't tell you how many people. I would say from five to ten people standing around the mission talking.
 {¶ 87} "Q: What was William doing? What did you see?
 {¶ 88} "A: William was, like, in a daze, like, just staring outside. And these people were, like, talking, wanting to knowabout the fire, who set it. This and that. And he's, they'retalking right in front of this little boy. So, I took him out of the mission and handed him to Jamon while I went to check on how my sister was in the ambulance." (Trial transcript at 1929) (emphasis added).
 {¶ 89} The foregoing testimony does not reasonably support the trial court's determination that someone near William more likely than not told him he had started the fire. Gilbert merely testified that people were "talking" and "wanting to know" about the fire and who set it. Her testimony is devoid of any indication that someone told William he started the fire or accused him of doing so. The trial court's conclusion that this probably happened is speculation. If there were evidence that someone actually, or even probably, told William he had started the fire before he made the statement overheard by Eddie Davis, we would find no abuse of discretion in the trial court's holding that the statement was not admissible as an excited utterance. The record before us, however, reveals only a possibility, not a probability, that William was "parroting" what someone else said about him starting the fire. In our view, the mere possibility that William might have been repeating what someone else said more properly goes to the weight of his statement, not its admissibility. Cf. State v. Daugherty (March 16, 1998), Licking App. No. 97-CA-99 ("The fact that the declarant spoke to her daughter before speaking to Detective Snow does not render the statement inadmissible as an excited utterance. * * * Appellant's claim that his mother's identification of him as the assailant was improperly influenced by his sister goes to the weight to be given the evidence, not its admissibility."); State v. Root,
Ashtabula App. No. 2003-A-0043, 2004-Ohio-2439, ¶ 22 (finding that a statement was admissible as an excited utterance even though it "potentially could have been influenced by some intervening cause" where "there was no indication of any such influence"); Pennsylvania v. Watson (Pa.Super. 1993),627 A.2d 785, 789 ("In any event, the circumstances surrounding the victim's statement warranted the trial court's conclusion that the child's statement implicating appellant was a spontaneous utterance made in response to a traumatic event and the severe physical pain which accompanied it. * * * Whether it was influenced by other events, of course, was relevant to the weight to be placed thereon. Under the circumstances of this case, however, those events did not destroy the admissibility of the child's statement."); Paxton v. Oklahoma (Okl.Cr. 1993),867 P.2d 1309, 1320 ("The fact that [the declarant] may have been around adults who may or may not have been talking about the shooting goes to the weight and credibility of [her excited utterance], not its admissibility.").
 {¶ 90} In its appellate brief, the State also suggests that William's statement was not admissible as an excited utterance because he was not competent to testify at trial. This argument lacks merit. Ordinarily, in determining whether a child is competent to testify, a court must consider "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." Statev. Frazier (1991), 61 Ohio St.3d 247, 251.
 {¶ 91} The Ohio Supreme Court has recognized, however, "that the testimonial incompetency of a child-declarant does not bar admission of the child's declarations as excited utterances."State v. Wallace (1988), 37 Ohio St.3d 87, 93; see also Statev. Said (1994), 71 Ohio St.3d 473, 477 n. 1. Moreover, as theWallace court explained, a child's ability to recollect, his understanding of truth and falsity, and his appreciation of the need to be truthful are not relevant to the admissibility of an excited utterance. Wallace, supra, at 94-95. This is so "because an excited utterance is made while the declarant is dominated by the excitement of the event and before there is opportunity to reflect and fabricate statements relating to the event. The trustworthiness of the declaration (as being what the declarant actually believes to be true) derives from the lack of opportunity to fabricate, not the moral character or maturity of the declarant. Similarly, the declarant's ability to recall is not an issue because of the requirement that the declaration be contemporaneous with its exciting cause or made while that cause dominates the declarant's thoughts." Id.
 {¶ 92} In the context of excited utterances, the only potentially relevant considerations are the child's ability to receive accurate impressions and ability to communicate current impressions. State v. Burnette (1998), 125 Ohio App.3d 278,286-287. Nothing in the record before us suggests that William lacked the capacity to receive accurate impressions of events around him. As for his ability to communicate those impressions, there is evidence that William became mixed-up several hours after the fire while speaking to Detective Stanley. When asked whether he started the fire, William alternatively shook his head affirmatively while saying "no" and shook his head negatively while saying "yes." (Trial transcript at 1550). On the other hand, William did communicate to Detective Stanley that the fire had been started with a red lighter, and this fact was conveyed to the jury. (Id. at 1550, 1557). As the State also pointed out to the jury, William communicated his recollection of where the fire had started by placing a mark on a diagram of the apartment. (Id. at 1266-1267). This mark was consistent with the State's physical evidence and its theory of the case. Therefore, despite the existence of some confusion when speaking to Detective Stanley several hours after the fire, the record persuades us that William possessed at least a basic ability to communicate his impressions accurately. For the foregoing reasons, we conclude that the trial court abused its discretion in excluding William's statement, "I start fire," which Eddie Davis claims he made as he was being carried away from the vicinity of the burning apartment.
 {¶ 93} We also decline to find that the exclusion of Davis' proffered testimony about William's excited utterance was harmless error. The State's evidence consisted primarily of Abner's confession that she started the fire in the living room and testimony from fire investigators who opined that the physical evidence supported her confession. In his excited utterance, however, William confessed to starting the fire. Moreover, Abner presented testimony from her own fire examiner, William Tenney, who opined, based on his review of the evidence, that the fire very well may have started in the bedroom. Tenney's testimony was consistent with Abner's theory that William started the fire in the bedroom. Therefore, regardless of our own views on the persuasiveness of the competing experts in this case or the truth of Abner's confession, we cannot say that the error in excluding Eddie Davis' testimony was harmless beyond a reasonable doubt. Abner's third assignment of error is sustained in part and overruled in part.
 {¶ 94} In her fourth assignment of error, Abner argues that the trial court erred when it made evidentiary rulings excluding evidence favorable to her and admitting unduly prejudicial evidence presented by the prosecution. Specifically, she contends the trial court erred in denying a jury view of the room where she confessed to police and in excluding her school records, two videos offered by her fire expert, and a picture of a gas-powered chainsaw inside the apartment after the fire. Abner also asserts that the trial court erred in admitting gruesome photographs of Ashleigh's body after the fire. We review the trial court's rulings on the foregoing issues for an abuse of discretion.State v. Taylor, Montgomery App. No. 20944, 2006-Ohio-843, ¶58.
 {¶ 95} With regard to Abner's first argument, she requested a jury view of the "room in which [she] was interrogated via the same route [she] was taken on September 9, 2002." The trial court denied the request, reasoning in part: "* * * According to Defendant, she was interrogated in an environment that led her to falsely confess. A view of the interrogation room and the route that Defendant took there, however, is not necessary to present such evidence to the jury. Witnesses, including the interrogating officers, are available to the defense to describe the environment and routes taken and not taken upon cross-examination." (Doc. #207 at 2). At trial, both parties did elicit testimony about the route Abner took to get to the interview room, the room itself, and the seating arrangements. We find no abuse of discretion in the trial court's denial of a jury view.
 {¶ 96} We reach the same conclusion with regard to Abner's school records. The only testimony about the records came from Marsha Watts, the director of pupil services for Miamisburg City Schools. Watts testified as the custodian of the records and stated only that exhibit R was a true and accurate copy of Abner's school records. The State later objected to the admission of the records, arguing that they were irrelevant, that they contained hearsay, and that there was "no testimony to them," an apparent reference to a lack of foundation. In response, Abner argued that a proper foundation had been provided and that the records were relevant to psychological traits such as her intelligence and behavior. The trial court sustained the State's objection without explanation.
 {¶ 97} Upon review, we find no abuse of discretion. Abner provided an inadequate foundation for the records, which included an educational plan and various evaluations. See, e.g., State v.Simms (1983), 10 Ohio App.3d 56, 58 (recognizing that "[i]dentification of an exhibit is only the first step in building a foundation for its admission"). Absent any substantive testimony about the records, the trial court did not abuse its discretion in preventing the jury from seeing them. Moreover, we note that Abner presented other evidence about her low intelligence and behavior while in school. For example, defense witness Jane Kinghorn, a retired school counselor, testified that Abner had learning disabilities, an IQ below 80, and limited cognitive skills. As a result, Kinghorn explained, Abner had participated in a special educational program while in school. Finally, Kinghorn remembered Abner as "a person who tried to please" and "[t]ried to do what she could." In light of Kinghorn's testimony, we would find no prejudice to Abner even assuming, arguendo, that the school records were admissible.
 {¶ 98} Abner's next argument concerns two videos she attempted to introduce into evidence through the testimony of William Tenney, her fire expert. The first video was entitled, "The Living Room Fire." Produced by Underwriters Laboratory, the video depicted the progression of a fire intentionally started in a living room. The second video was from the Ohio Fire Academy. It demonstrated the difference a sprinkler system makes in the progression of a house fire. The State objected to the videos on several grounds. The trial court ultimately held that the videos constituted inadmissible hearsay. As a result, it ruled that they could not be used as substantive evidence to support Tenney's opinions.
 {¶ 99} On appeal, the parties dispute whether the videos constituted proper demonstrative evidence. Such evidence is admissible if relevant, if substantially similar to the object or occurrence it is intended to represent, and if it does not confuse the issues or mislead the jury. State v. Jackson
(1993), 86 Ohio App.3d 568, 571. Upon review, we agree with the State's argument that the videos do not show a fire that is substantially similar to the one at issue in the present case. Among other distinctions, we note that the fire in the present case allegedly was started with an accelerant whereas the fires in the videos were not. As a result, it is reasonable to conclude that the speed and intensity of the fires in the videos differed from the fire started in Abner's apartment. We note too that Abner's appellate brief fails to address the trial court's hearsay finding, which was the basis for its exclusion of the videos. Absent any argument from Abner on this point, we find no abuse of discretion in the trial court's exclusion of the videos.
 {¶ 100} Abner next challenges the trial court's exclusion of a picture of a gas-powered chain saw. In the picture, the chain saw is shown sitting in the kitchen of the apartment along with other fire-fighting equipment. Abner argues that the picture should have been admitted into evidence because the presence of a gas-powered chain saw at the scene provides an explanation for the scent of gasoline later detected by an accelerant-sniffing dog.[3]
 {¶ 101} Upon review, we find no abuse of discretion in the trial court's exclusion of the photograph. At trial, Abner's counsel pointed out the chain saw in the photograph and questioned fire investigator Mark Shockman about it. Shockman denied observing the chain saw at the scene, however, and he testified on re-direct examination that he did not take the photograph. Notably, no witness testified about the chain saw being present in the kitchen after the fire. Absent any testimony identifying the photograph as being a true and accurate representation of the kitchen following the fire, the trial court did not abuse its discretion in finding the photograph inadmissible. As we recognized in State v. Griffin, Montgomery App. No. 20681, 2005-Ohio-3698, "`[a] picture cannot be admitted without a proper foundation. There must be testimony that the photograph is a fair and accurate representation of that which it represents.'" Id. at ¶ 59, quoting Heldman v. Uniroyal, Inc.
(1977), 53 Ohio App.2d 21, 31.
 {¶ 102} Abner's final evidentiary argument concerns the trial court's admission of five pictures of Ashleigh's body. She contends the pictures, which were identified as State's exhibits 1 through 5, lack relevance and are unduly prejudicial. It is well settled that when considering the admissibility of photographs, a trial court must decide whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. State v. Morales (1987),32 Ohio St.3d 252, 257. The admission or exclusion of photographs is left to the sound discretion of the trial court. Id. Thus, an appellate court reviews a decision on the admissibility of such evidence for an abuse of discretion.
 {¶ 103} State's exhibit 1 showed Ashleigh's body as it appeared upon arrival at the coroner's office. Abner did not object to this picture, and we find no plain error in its admission. Exhibit 2 was a coroner's identification photograph, showing the child's head and upper chest. Abner objected to it on the basis of relevance and undue prejudice. We find no abuse of discretion in the trial court's admission of this picture. It merely presented a closer view than exhibit 1, which was admitted without objection. Cf. State v. Reed, Montgomery App. Nos. 18417, 18448, 2001-Ohio-1537 (recognizing that multiple pictures may be admitted when they involve "different levels of focus"). Exhibit 3 showed one of Ashleigh's lungs with black soot. Abner did not object to it, and we find no plain error. At trial, the coroner explained that the soot indicated Ashleigh had been alive during the fire. Exhibit 4 depicted soot on Ashleigh's tongue, voice box, and esophagus. Exhibit 5 presented a closer view of the larynx and voice box with black soot. Abner did not object to exhibit 4. She objected to exhibit 5, however, on the basis that it was cumulative of exhibit 4. The trial court agreed and required the State to select either exhibit 4 or 5 for presentation to the jury. The State elected to show exhibit 5, and we find no abuse of discretion in its admission. Again, the soot supported the State's argument that Ashleigh had been alive during the fire. In short, we cannot say that the trial court abused its discretion in admitting the two pictures to which Abner objected, and we find no plain error in the admission of the others. Abner's fourth assignment of error is overruled.
 {¶ 104} In her fifth assignment of error, Abner maintains that she received ineffective assistance of trial counsel. In support, she cites seven instances where her trial counsel failed to object to testimony that she contends was inadmissible and prejudicial to her.
 {¶ 105} We review Abner's claim under the two-part test ofStrickland v. Washington (1984), 466 U.S. 668. "To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." State v. Madrigal,87 Ohio St.3d 378, 388-389, 2000-Ohio-448. When evaluating an ineffective assistance of counsel claim, "[j]udicial scrutiny of counsel's performance must be highly deferential." Strickland, supra, at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Bradley (1989),42 Ohio St.3d 136.
 {¶ 106} Abner's first argument concerns fire investigator Mark Shockman's testimony about two photographs showing Ashleigh's body inside the burned apartment. Abner contends the pictures and related testimony were objectionable because they are unduly prejudicial and not particularly relevant. Upon review, however, we cannot say that defense counsel's failure to object constituted deficient representation. The pictures and testimony corroborated other testimony about the location of Ashleigh's body in the residence. Moreover, defense counsel reasonably may have decided not to object to testimony about the effect of the fire on Ashleigh's body because Shockman simply repeated what the coroner already had told the jury.
 {¶ 107} Abner next argues that defense counsel provided ineffective assistance by failing to object to Shockman's testimony about an air conditioner shown in photographs identified as State's exhibits 42 and 43. After reviewing the photographs, Shockman stated that he had observed the air conditioner in an alley below the apartment. Shockman explained that, in the course of his investigation, another firefighter told him the air conditioner had been pushed out the apartment's bedroom window "late in the fire." Shockman opined that the condition of the air conditioner helped him determine the origin of the fire. He testified that if the fire had started in the bedroom, as Abner alleged, the electrical cord and many small plastic pieces on the air conditioner would have been melted by the intense heat. The fact that they were not melted indicated to him that the fire had not started in the bedroom.
 {¶ 108} Abner argues that Shockman's testimony about how the air conditioner got in the alley was hearsay and that he was not qualified to discuss "the workings of window air conditioners." In response, the State contends the lack of a hearsay objection did not prejudice Abner because the firefighter who pushed the air conditioner out of the bedroom window, Robert Robinson, testified about what he had done. The State also asserts that Shockman was qualified to testify about the air conditioner's appearance and basic operation.
 {¶ 109} Upon review, we agree with the State that it was reasonable for Shockman to provide limited testimony about the appearance and functioning of the air conditioner. The essence of his testimony was that none of the air conditioner's components were melted, suggesting that it had not been subjected to intense heat. Defense counsel did not provide deficient representation by failing to object to this testimony.
 {¶ 110} On the other hand, we believe defense counsel did provide deficient representation by failing to object to Shockman's testimony about the air conditioner being pushed out of the bedroom window by another firefighter. Shockman admitted that he lacked first-hand knowledge about how the air conditioner shown in State's exhibits 42 and 43 had ended up in the alley. Instead, he testified that another firefighter reported having pushed it out of the bedroom window. The State asserts that this other firefighter was Robert Robinson. In reality, however, Robinson, testified that he had pushed the air conditioner out of the apartment's kitchen window, not the bedroom window. (Trial transcript at 1014-1015, 1030-1032). Robinson's testimony is consistent with Shockman's recollection that he saw a piece of a dish rag stuffed in the air conditioner in the alley. (Id. at 1098).
 {¶ 111} We recognize that the apartment had two air conditioners, one in the bedroom window and one in the kitchen window. (Id. at 1867). The State cites no testimony from anyone with first-hand knowledge, however, establishing that the air conditioner found in the alley and depicted in State's exhibits 42 and 43 came from the bedroom window rather than the kitchen window. The State relies solely on the testimony of firefighter Robinson, who unambiguously testified that he pushed the air conditioner out of the kitchen window. Both parties agree that the kitchen did not sustain serious fire damage. Therefore, it the air conditioner shown in State's exhibits 42 and 43 came from the kitchen window, the lack of any melting is easy to explain and uncontroversial. At trial, however, the State suggested, through the testimony of fire investigator Shockman, that the air conditioner had been pushed from the bedroom window and that the lack of melting or other fire damage discredited Abner's argument that the fire had started in the bedroom. Because Shockman's testimony appears to have been based on a mistaken belief about the location of the air conditioner shown in State's exhibits 42 and 43, we believe defense counsel provided deficient representation by failing to object to it. We also conclude that the lack of an objection was prejudicial, insofar as the State relied in part on Shockman's testimony to discredit Abner's theory that the fire had been started in the bedroom by William.
 {¶ 112} Abner next argues that defense counsel provided ineffective assistance by failing to object to the testimony of dog-handler Dennis Cummings. She contends her attorney should have made a Daubert challenge to Cummings' testimony about accelerant-sniffing dogs and their ability to detect scents beyond what can be detected in a laboratory.
 {¶ 113} Upon review, we cannot say that defense counsel provided deficient representation or that the lack of an objection prejudiced Abner. The State qualified Cummings as an expert witness, and he testified extensively about his training and qualifications, the training and qualifications of his accelerant-sniffing dog, Harvey, and use of dogs to investigate fires. We see nothing objectionable about the bulk of Cummings' testimony. Abner specifically complains, however, about Cummings' testimony that "[t]he sense of the canine is capable to go beyond a point wherein mechanical instrumentation used in a laboratory can sort out and detect." Cummings provided this testimony to help explain why subsequent laboratory analysis found no traces of any ignitable liquid where Harvey had alerted in the apartment. Abner argues that there was no foundation for Cummings' testimony that a dog can smell things beyond what laboratory analysis can detect.
 {¶ 114} We agree that Cummings provided no foundation for his testimony about a dog's olfactory sensitivity. Therefore, defense counsel arguably provided deficient representation by failing to object to it.[4] On the present record, however, it is impossible to say that the lack of an objection prejudiced Abner because we do not know whether Cummings could have established a proper foundation for his opinion if he had been asked to do so. As a result, we find no ineffective assistance of counsel.
 {¶ 115} Abner's next two arguments concern a gas can and lighter discovered near the apartment shortly after the fire. She contends defense counsel provided ineffective assistance by not objecting to hearsay testimony from fire investigator Shockman about the gas can. We find no deficient representation with regard to Shockman's testimony. The essence of his testimony was that a woman approached him during his investigation and asked whether he would be interested in seeing a gas can in the alley. He stated that he followed the woman and discovered a two-gallon, plastic gas can and a red Bic lighter under a fire escape "a very short distance" from Abner's apartment. We see nothing objectionable about this testimony.
 {¶ 116} Abner also contends that any testimony about the gas can and lighter was irrelevant because the items were never linked to this case. We disagree. In her confession, Abner stated that she had started the fire by pouring gasoline from a small, red, plastic gas can and igniting it with a lighter. The discovery of a small, red, plastic gas can and lighter near the apartment was consistent with Abner's story, and it was reasonable to infer that she had used those items to start the fire.
 {¶ 117} Abner next argues ineffective assistance of counsel based on her attorney's failure to object to testimony from Ashley Hamblin, who worked as a clerk at a tobacco shop across the street from the apartment. Hamblin testified that Abner entered the shop with her two children the day before the fire. She recalled seeing Abner grab five-year-old William and whip him around when he wanted a piece of gum. According to Hamblin, Abner then stated that "one of these days she was going to kill these kids." Abner argues that defense counsel should have objected because any probative value of this testimony was substantially outweighed by the danger of unfair prejudice.
 {¶ 118} We find no deficient representation in defense counsel's failure to object to Hamblin's testimony. One day after Abner spoke to Hamblin about killing her children, two-year-old Ashleigh died in a fire that Abner confessed to setting. Under these circumstances, defense counsel reasonably could have concluded that Hamblin's testimony was admissible and withheld an objection.
 {¶ 119} Abner's final argument under her fifth assignment of error is that defense counsel provided ineffective assistance by failing to control Mark Shockman on cross examination. In particular, she contends her attorney should not have permitted Shockman to provide damaging hearsay testimony about marks William made on a diagram to indicate where he had seen the fire inside the apartment. Defense counsel's questions about the diagram and Shockman's answers were as follows:
 {¶ 120} "Q: The diagram was what?
 {¶ 121} "A: It was drawn by — actually, the diagram was drawn by Tina [Robinson]. And William drew some markings on the diagram, showing Tina, his grandmother, where, to show where he first saw the fire.
 {¶ 122} "Q: Was that helpful?
 {¶ 123} "A: It was incredibly helpful. This, this was a diagram that Tina drew. So, it was very crude. But it was very, it was clearly evident it showed the couch, the table, the TV, basically just showed the living room. When Tina came back to the interview area, the big training room that we were in she said: [`]I think you guys might want to see this. I sat down and asked William where he saw the fire. William said, he put a mark right there (indicating).['] And that was exactly in the same place where we see the ignitable floor patterns." (Trial transcript at 1266-1267).
 {¶ 124} The State contends defense counsel reasonably elicited the foregoing testimony to show that Abner's various statements to police about where the fire had started were inconsistent with William's markings, thereby undermining the reliability of her confession. We find the State's argument to be unpersuasive. Although Abner initially provided different accounts about where the fire had started, she ultimately confessed to starting the fire by pouring gasoline in the living room and igniting it. The physical evidence was consistent with Abner's confession. (See, e.g., Trial transcript at 1640-1641; Defendant's exhibit J at 6-8, 13-14). Therefore, we see no reasonable justification for defense counsel to have buttressed the State's case by introducing hearsay testimony from Shockman about William seeing the fire where the State's physical evidence indicated that it had started. This testimony was particularly damaging to Abner because it undermined her claim that William had started the fire in a bedroom. It also undermined the proffered testimony of Eddie Davis, who allegedly overheard William make the excited utterance that we discussed in Abner's third assignment of error.
 {¶ 125} Having determined that Abner's convictions must be reversed for the reasons set forth in our analysis of her third assignment of error, however, we need not decide whether defense counsel's elicitation of the hearsay testimony from Shockman and defense counsel's failure to object to Shockman's testimony about an air conditioner being pushed out of the bedroom window were prejudicial enough, standing alone, to warrant the reversal of Abner's convictions. Nevertheless, when viewed in conjunction with the trial court's exclusion of Eddie Davis' proffered testimony about William's excited utterance, these errors lend additional support to our conclusion that her convictions must be reversed. Abner's fifth assignment of error is sustained in part and overruled in part, as set forth above.
 {¶ 126} In her sixth assignment of error, Abner contends her convictions are based on legally insufficient evidence and are against the manifest weight of the evidence. Abner's sufficiency-of-the-evidence argument rests on the premise that her confession should have been excluded from evidence. Absent that confession, she argues, the remaining evidence was legally insufficient to sustain her various convictions. With regard to her manifest-weight argument, Abner merely asserts, in conclusory fashion, that "the greater weight of the evidence in this case did not support the verdict rendered by the jury."
 {¶ 127} Upon review, we find the foregoing arguments to be unpersuasive. When a defendant challenges the sufficiency of the evidence, she is arguing that the State presented inadequate evidence on each element of the offense to sustain the verdict as a matter of law. State v. Hawn (2000), 138 Ohio App.3d 449,471. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, at paragraph two of the syllabus.
 {¶ 128} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Statev. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 129} Based on our review of the entire record, and with the foregoing standards in mind, we conclude that Abner's convictions are based on legally sufficient evidence and are not against the manifest weight of the evidence. As noted above, Abner's sufficiency-of-the evidence argument rests on the premise that her confession should not have been admitted into evidence at trial. We rejected this argument in our analysis of Abner's first assignment of error, supra. In light of Abner's admissible confession and the other evidence presented by the State, we are convinced that a rational trier of fact could have found the essential elements of her crimes proven beyond a reasonable doubt. We are equally convinced that the evidence does not weigh heavily against Abner's convictions and that the jury did not clearly lose its way and create a manifest miscarriage of justice when it found her guilty.[5] Accordingly, we overrule Abner's sixth assignment of error.
 III. Conclusion {¶ 130} Having sustained portions of Abner's third and fifth assignments of error, we hereby reverse the judgment of the Montgomery County Common Pleas Court and remand the cause for further proceedings.
Wolff, j., and Glasser, J., concur.
(Hon. George Glasser, Retired from the Sixth Appellate District, Sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
[1] As for Williams' personal opinion that Abner's own confession was false, she conceded in the trial court that such testimony is inadmissible.
[2] On appeal, the State contends Detective Stanley learned that "a number of people" had told William that he had started the fire. The only person Stanley identified as having told William that, however, was Abner's mother, Tina Robinson. (Trial transcript at 1559). Nothing in Robinson's testimony reveals that she ever made such a comment to William. More importantly, even if, at some point, she did tell William that he had started the fire, nothing in the record indicates that she did so before he made the remark overheard by Eddie Davis while the fire was burning.
[3] We note, however, that the dog detected the scent of an accelerant in another room, away from where the chain saw is shown sitting. Moreover, fire investigator Mark Shockman testified that no chain saw was used in the room where the dog alerted to the scent of an accelerant.
[4] The lack of an objection reasonably might have been trial strategy, however, if defense counsel knew Cummings could lay a proper foundation for his opinion. In such a case, an objection would only allow Cummings to underscore his opinion and its reliability.
[5] Despite our finding that Abner's convictions are not against the manifest weight of the evidence, those convictions nevertheless must be reversed for the reasons set forth in our analysis of her third assignment of error.