[Cite as *State v. York*, 2018-Ohio-612.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27521 |
| | : | |
| v. | : | Trial Court Case No. 2014-CR-234 |
| | : | |
| JESSE L. YORK | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of February, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

HILARY LERMAN, Atty. Reg. No. 0029975, 249 Wyoming Street, Dayton, Ohio 45409
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant Jesse York appeals from his conviction and sentence for murder. He contends that cumulative errors deprived him of a fair trial. We conclude that York has failed to establish any error, let alone cumulative error, that would affect his right to a fair trial. Accordingly, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶ 2} This case arises from the 2013 death of R.S (hereinafter "R."). R. was born in January of 2012 to Helen Thompson and Brad Sellars. Sellars and Thompson, who were not married and not living together at the time of R.'s birth, also had an older child together. R. resided in Germantown with Thompson and the older sibling. Sellars generally exercised parenting time with the children on Wednesdays and every other weekend. In early 2013, Thompson began dating York who moved into the residence with Thompson and the children.

{¶ 3} On October 23, 2013, Sellars exercised visitation with the children. When R. returned home, she was eating and playing normally. That night, she woke up vomiting and was disoriented. Thompson took R. to the pediatrician the next day. R. was diagnosed with a virus and sent home. R. improved that day and exhibited no further signs of illness.

{¶ 4} Sellars also exercised parenting time on the weekend of November 9. He and his mother took the children to a restaurant on Saturday. While there, R. walked around the table and bumped her head. According to Sellars and his mother, she fussed for a few minutes, but was fine thereafter. The next day, Sellars took the children to

Build-A-Bear Workshop at the mall. Sellars returned the children to Thompson that night.

{¶ 5} The next day, November 11, 2013, R. attended daycare. She exhibited no signs of illness that day, and she acted normally that evening at home. However, after midnight, she began to vomit. She vomited approximately four times during the night. The next day, Thompson took R. to her pediatrician where she was, again, diagnosed with a viral infection. The doctor told Thompson to allow R. to rest and to give her Pedialyte to help keep her hydrated. Thompson and R. remained at home for the rest of the day. By that evening, R. was doing better; the vomiting had stopped, and she was eating, drinking and playing normally. On the morning of November 13, R. was a little sleepy, but otherwise was acting and eating normally. However, Thompson decided to keep her home from daycare.

{¶ 6} Thompson left for work at 10:20 that morning. She left R. in York's care. No one else was in the home when Thompson left as the older sibling was at school. At noon, Thompson sent York a text message asking about R. York responded that R. was fine and that she was playing with her toys. At 1:30 p.m., York called Thompson stating that R. had become "unresponsive." Thompson immediately drove home, which took approximately five minutes. Once there, she observed York on the couch with R. in his arms. She observed that R. was breathing but unresponsive. She told York to call 911.

{¶ 7} R. and Thompson were transported to Dayton Children's Hospital by ambulance. During the ride, Thompson noted a mark under the child's eye. At the hospital, staff determined R. to be "severely impaired from a neurologic point of view." Attending neurosurgeon, Laurence Kleiner, was called in to examine R. Kleiner noted

that R. was breathing spontaneously, but was exhibiting "writhing-like activity." A CAT scan of the head and diagnostic blood tests were performed. The CAT scan revealed "significant cerebral swelling." On physical exam, Kleiner found R. could not open her eyes and could not respond or make purposeful movements. Kleiner rated R. as a "6 on the Glascow Coma Scale."[1] R. was placed on a ventilator and admitted to the pediatric intensive care unit for treatment and further testing. By 8:00 p.m. that evening, R.'s condition had deteriorated and Kleiner ordered an MRI. The test indicated that the brain swelling had increased. Kleiner conducted an examination and concluded that R. met the clinical criteria for brain death.

{¶ 8} On Thursday morning, November 14, R., while still on life support, was examined by Dr. Lori Vavul-Roediger who is a board-certified child abuse pediatrician and the director of the Department of Child Advocacy at Dayton Children's Hospital. Vavul-Roediger observed bruising under R.'s right eye and right upper scalp. She also observed hemorrhaging in the left eye and small bruises to R.'s right ear. She noted a laceration in R.'s mouth that corresponded to a bruise on the outside of her cheek.

{¶ 9} Ultimately, pursuant to protocol, another examination was performed to confirm that R. met the criteria for brain death. She was removed from life support and pronounced dead at 11:00 a.m. on November 15, 2013.

{¶ 10} On August 29, 2014, York was indicted on two counts of murder, one count of involuntary manslaughter, two counts of endangering children, and one count of felonious assault. Discovery was conducted. York filed a motion to suppress. Following a hearing, the motion was denied. On March 5, 2017, the State filed a motion

---

[1] According to the record, anything less than an 8 indicates severe head injury.

in limine to exclude the introduction of evidence of domestic violence between Sellars and his girlfriend.

{¶ 11} A six-day jury trial commenced on March 7, 2017. At trial, Thompson testified that while in the waiting room of the hospital on Wednesday, November 13, she kept asking York what had happened to R. She testified that he kept responding, "I don't know." Thompson testified that York then began asking her about a text message he had received from a friend, T.J. Vickroy, concerning sexual activity involving Thompson. Thompson informed York that she did not want to discuss the matter at that time. Thompson testified that on the following morning York left the hospital to return home. At some point that day, Thompson was informed that R. was clinically brain dead. She testified that York returned to the hospital that evening and appeared to be intoxicated and not "capable of conversation." Thompson asked York's mother to take him home.

{¶ 12} The State also presented Carlie Woodward who testified that she is a friend of Thompson's and that she runs the daycare that R. attended. She testified that R. appeared fine on November 11 while at the daycare. She further testified that she communicated with Thompson regarding R., and was informed on the evening of November 12, after the trip to the pediatrician, that R. was fine. Woodward testified that she received a video from Thompson showing R., on November 12, dancing and singing in her crib. Woodward testified that she went to Dayton Children's Hospital on Thursday morning. She testified that she spoke to York who told her that he did not know what had happened to the child. York told Woodward that he had placed R. in her crib for a nap and that when he tried to wake her later, she was unresponsive.

{¶ 13} Dr. Kleiner testified that he observed bruising on R.'s face under her right

eye, her ear, left and right scalp and on her cheek. The bruising on the cheek corresponded to a laceration found on the inside of R.'s mouth near her gum line. Kleiner testified that based upon R.'s history and injuries there was a very high likelihood that her condition was the result of abuse. He further testified that, in his opinion, R.'s injuries were sustained on the day she presented to the hospital.

{¶ 14} Dr. Vavul-Roediger testified that she observed all of the bruising that Kleiner had described. She also observed hemorrhaging in the left eye. She testified that R. suffered significant head trauma caused by multiple impacts to her head. She testified that while she could not give a precise time of the injuries, she could state that R. would not have been able to walk, talk or eat after sustaining such injuries.

{¶ 15} Montgomery County Deputy Coroner, Bryan Casto, M.D., testified that he performed R.'s autopsy on November 16, 2013. In addition to the injuries observed by Kleiner and Vavul-Roediger, Casto testified that he observed extensive injuries underneath R.'s scalp. Specifically, he observed bruising which extended the full thickness of the scalp and which caused staining to the skull. Casto observed a large central bruise located where the scalp sits on the top of the head. He also observed pattern injuries consisting of several half-inch circular bruises each separated by a "fairly uniform half-inch of spared skin that is not bruised." These pattern injuries were observed on the left, right and back of the scalp. Casto testified that the central bruise appeared different from the pattern injuries and that it appeared to be healing.

{¶ 16} Casto testified that he also examined R.'s brain which showed significant swelling. He testified that he also found subarachnoid and subdural bleeding. The dura is a tough membrane found beneath the skull covering the brain. Beneath that is the

arachnoid membrane which is a thinner, translucent covering of the brain.

{¶ 17} Casto testified that he looked at microscopic samples from the bruising on the scalp. He testified that he found evidence of iron and fibrosis on the larger central bruise. Casto testified that the iron and fibrosis indicated that the large bruise was an older injury that was resolving. However, he testified that the pattern bruises were acute injuries meaning that they did not show any evidence of healing. He testified that he classified R.'s death as a homicide resulting from blunt force trauma to her head.

{¶ 18} Brad Daugherty, a homicide investigator with the Montgomery County Sheriff's Office, also testified at trial. He testified that he was assigned to assist Germantown police with the investigation of R.'s death. Daugherty testified that on Thursday, November 14, he accompanied Detective Swatford and Major Burns, both members of the Germantown police department, to interview York whom they found at his mother's residence. Daugherty testified that they sat with York and his mother around the kitchen table while they conducted the interview. York told them that R. had acted fine in the morning. He told the officers that he was alone with R. and no one else was in the residence. York told the officers that R. did not fall or hit her head that day. He stated that R. fell asleep on the couch, and that he cleaned the residence while she slept. York stated that when he attempted to wake R., he could not get her to respond. York further stated that the back of R.'s head was wet with perspiration, and that her eyes were unfocused. York stated that he called Thompson and then checked R.'s eyes with a flashlight. According to York, R. had the same type of unresponsiveness a couple of weeks earlier.

{¶ 19} Daugherty testified that he obtained a search warrant for the

Thompson/York residence where he found a grocery bag outside of the apartment's front door. The bag held a diaper, a baby wipe, some toilet paper and a rag with either vomit or blood on it. Daugherty also removed a pillow and sheet from R.'s crib. He testified that a search of York's cellular telephone and records obtained from his service provider indicated that York had deleted some text messages from the morning of November 13. Specifically, the cell phone provider's records indicate that York received a 9:38 a.m. text from T.J. Vickroy informing York that Vickroy and his girlfriend were breaking up due to a sexual encounter that occurred between Vickroy, his girlfriend, Thompson and another woman. Vickroy also indicated that he believed his girlfriend and Thompson were involved romantically with each other. At 9:41 a.m.,York sent a text in response asking how long ago the encounter had occurred. Vickroy did not respond. Thompson texted York at 11:48 asking how her baby was doing. York responded a minute later, "good just chilling playing with toys." The actual phone did not contain these texts.

{¶ 20} Dr. Lora Ellis, R.'s pediatrician, also testified on behalf of the State. According to Ellis she did not see R. during the October 2013 visit. Instead, R. was seen by one of her partners. Ellis reviewed the documentation of that visit and did not note any complaints or findings regarding possible head injuries. Ellis did see R. during the November 11, 2013 visit. She testified that she did not observe any bruising on R. Nor did she observe any mouth laceration when she checked R.'s mouth. Ellis testified that R. was acting appropriately during the visit. Ellis testified that she did not observe anything that would indicate the need for a neurological examination at that time.

{¶ 21} Amy Dallaire, a forensic serology and DNA scientist with the Miami Valley Regional Crime Laboratory, testified for the State. According to Dallaire, the pillow and

its case removed from R.'s crib testified positive for blood. When the blood from the pillow was tested, Dallaire found mixed DNA, one of which was positively identified as R.'s. The blood from the case also matched R.'s DNA. The crib sheet tested positive for blood, but the sample was not sufficient to permit a DNA analysis. The baby wipe contained DNA that was a match for R. The toilet paper contained DNA from a single male source.

{¶ 22} York, turning to the defense case, presented the testimony of Dr. Janice Ophoven, a specialist in pediatric forensic pathology. She testified that she reviewed the entire record including R.'s medical history and Casto's autopsy report. Ophoven also requested special staining studies of the dura, scalp and left eye. The additional staining studies were performed by Dr. Casto's office and delivered to Ophoven. Ophoven testified that it was her opinion that R. died from complications stemming from a pre-existing traumatic brain injury which she opined had occurred "many, many days" before R.'s hospitalization. Ophoven testified that the injuries likely occurred on or around October 24, 2013, the date of R.'s first visit to the pediatrician with vomiting. She based her opinion on her observation of iron found in the three staining samples, as well as the fact that there was new tissue growth on the larger central bruising area, and, finally, the fact that the blood located in the lining of the skull and along the surface of the brain contained evidence of iron.

{¶ 23} York also called Brad Sellars as a witness. At that time, the State reiterated its motion in limine to exclude evidence of domestic violence between Sellars and his girlfriend. The defense did not object and stated that it had no response to the motion. The trial court sustained the motion. Sellars then testified that he had

exercised parenting time with R. the weekend before her death. He testified that she had a minor bump to her head while at a restaurant. He further testified that she was able to fully participate at the Build-a-Bear Workshop at the mall the next day, including "hands-on" activities.

{¶ 24} In rebuttal, the State presented the testimony of Dr. Joseph Felo who is the Chief Deputy Medical Examiner for Cuyahoga County. Felo testified that he had reviewed the entire record including Dr. Ophoven's report. He agreed with Casto's assessment that R. had an older injury as well as new injuries to her head, and that she died from multiple blunt force impacts to her head that occurred on the day she was hospitalized. Felo testified that it was "very unlikely" that R. could have eaten, watched television or communicated after suffering the observed head trauma. He testified that he found no evidence to support Ophoven's claim that the injuries occurred on October 24, 2013.

{¶ 25} Dr. Casto was also called in rebuttal. He testified that he disagreed with Dr. Ophoven's conclusions. First, he testified that, while the subarachnoid and subdural blood did contain evidence of prior injury, they also contained evidence of fresh red blood cells. He testified that the mere presence of old injury does not "negate the presence of a new amount of blood or a new collection of blood." Tr. 900. With regard to the scalp, he reiterated his prior testimony that the larger central injury looked different on autopsy than did the smaller circular injuries. He testified that to fulfill Dr. Ophoven's request, he sampled two areas of the scalp taking a sample from the older injury and a sample from one of the newer injuries. Both samples were placed on the same slide for Dr. Ophoven's staining studies. He testified that the iron staining showed "abundant iron"

on the larger central bruise which was consistent with his original classification of that bruise as an older injury. According to Casto, Ophoven ignored the fact that the smaller pattern injury sample had "almost no iron, one cell contains iron [and] clearly would not be categorized as the same level of healing as the larger injury." Tr. 906. He further testified that Dr. Ophoven did not present any microscopic photos of the newer injuries during her testimony and that she did not "mention the smaller fragment representing the more acute trauma to [R.'s] scalp." Tr. 907.

{¶ 26} The jury found York guilty of all the indicted counts. At sentencing, the trial court merged all the counts. The State elected to proceed to sentencing on the murder charge contained in Count II of the indictment (proximate result; felonious assault). York was sentenced to a mandatory term of fifteen years to life in prison. York appeals.

## II. Analysis

{¶ 27} York's sole assignment of error states as follows:

THE CUMULATIVE RESULT OF THE COURT'S DECISIONS WERE CONTRARY TO JUSTICE AND PREJUDICIAL TO DEFENDANT-APPELLANT.

{¶ 28} York contends that the cumulative effect of errors made by the trial court during the course of the proceedings denied him a fair trial.

{¶ 29} The Ohio Supreme Court recognized the doctrine of cumulative error in *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987). "Pursuant to this doctrine, a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances

of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). However, the doctrine does not apply unless there are "multiple instances of harmless error." *Id.* "In order to find cumulative error, we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors." *State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 58, citing *State v. Kelly*, 2d Dist. Greene No. 2004–CA–20, 2005–Ohio–305, ¶ 33.

{¶ 30} York first contends that the trial court erred by sustaining the motion in limine filed by the State which sought to block evidence of alleged domestic violence between Sellars and his girlfriend. He further contends that the trial court impermissibly interfered with his examination of Sellars. In support, York argues that Ophoven's testimony that the injury did not occur on the day of the hospitalization discredits the State's theory that, because he was alone with R., he was the only possible source of the injuries. Thus, he argues that he should have been permitted to present a defense that Sellars was a potential suspect since Sellars exercised parenting time just prior to each of the episodes of vomiting.[2] York contends that the evidence of the domestic violence as well as the testimony he attempted to elicit from Sellars was relevant to show that Sellars had a bad temper and also had the opportunity to harm R.

{¶ 31} We begin first with the motion in limine. Evid.R. 404(A) provides that although it may be relevant, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular

---

[2] According to the record, vomiting can be a symptom of head injury.

occasion." Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "The burden is on the proponent of extrinsic act evidence to demonstrate that the relevancy of the extrinsic act does not pertain to character and conforming conduct." *State v. Nucklos*, 171 Ohio App. 3d 38, 2007-Ohio-1025, 869 N.E.2d 674, ¶ 86 (2d Dist.), citing *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215.

{¶ 32} In analyzing this argument, we are cognizant of the discrepancy in the medical testimony. Specifically, Casto, Felo, and Kleiner opined that the injuries responsible for R.'s death occurred sometime on the day she was hospitalized. Vavul-Roediger echoed this testimony when she opined that R. could not have been behaving normally after the injuries were inflicted. Conversely, Ophoven opined that the injuries occurred on or around October 24 when R. first presented to the pediatrician with complaints of vomiting.

{¶ 33} Further, our analysis must include the fact that York did not respond, nor object, to the State's motion. Nor did he make a proffer of any evidence. Accordingly, he has waived all but plain error. This court has previously stressed "we recognize plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' In order to prevail on a claim governed by the plain error standard, [the defendant] must demonstrate that the outcome of [his] trial would clearly have been different but for the errors that [he] alleges." (Internal citations omitted.) *State v. Carpenter*, 116 Ohio App.3d 615, 621, 688 N.E.2d 1090 (2d Dist. 1996).

{¶ 34} Finally, "[t]he decision whether to admit or exclude evidence rests within the sound discretion of the trial court and its decision in such matters will not be reversed on appeal absent an abuse of discretion and material prejudice," *State v. Brewer*, 2d Dist. Greene No. 03CA0074, 2004-Ohio-3572, ¶ 58. An abuse of discretion occurs when the trial court exhibits an arbitrary, unreasonable or unconscionable attitude. *Id.*

{¶ 35} York was able to establish through Thompson that Sellars exercised parenting time with R. prior to each of her vomiting episodes. Thus, he was able to demonstrate opportunity. The only other reason he cited for using this evidence was to show that Sellars had a bad temper; something that is barred by Evid.R. 404. We conclude that York has failed to establish error, let alone plain error. There is no showing, and we cannot discern, how evidence of possible violence between Sellars and his girlfriend would be relevant to this case, nor how the evidence is admissible for any of the purposes set forth in Evid.R. 404(B).

{¶ 36} We next turn to what York deems to be improper interference by the trial court during his examination of Brad Sellars. York contends that the trial court, without objection by the State, made various statements during the examination.

{¶ 37} We note that the trial court permitted defense counsel to ask numerous leading questions of Sellars before interjecting to comment that counsel should remember that he was conducting direct examination rather than cross. Defense counsel said, "ok," and proceeded to continue questioning Sellars. After two questions, defense counsel again began to ask leading questions, at which point the trial court asked "Do you know what that means?"

{¶ 38} The trial court's control over the questioning of witnesses is governed by

Evid.R. 611 which provides:

> (A) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
>
> * * *
>
> (C) Leading questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

{¶ 39} Sellars was called as a witness by York. York did not claim that Sellars was a hostile witness. Thus, we find the trial court did not abuse its discretion when admonishing counsel to discontinue the leading questions.

{¶ 40} York further contends that the trial court sustained several objections by the State without any basis for such a ruling. York asked Sellars what he and R. typically did on their weekends together. The State objected, and the trial court sustained the objection. York did not seek to question the ruling at a sidebar. We agree with the State that, while there is no explanation in the record for the objection or the ruling thereon, the trial court could have found that the question was overly broad as it was not limited to the time frame around R.'s death. In any event, we find no abuse of discretion.

{¶ 41} York also asked Sellars whether, when Thompson called him, she informed him that R. had become unresponsive. York later asked whether Thompson was able to directly call Sellars' number. The State objected to both questions, and the trial court sustained the objections. We note that the first question was leading and seems to ask for hearsay evidence. The second question asked Sellars to testify as to what another individual was able to do without establishing whether he had knowledge of Thompson's actions. Again, York did not contest the ruling and did not pursue either question further. We cannot say that the trial court abused its discretion with regard to either question.

{¶ 42} Finally, at another point in the direct examination, the trial court interjected and stated, "I think you're confusing him with the question * * * [i]f you can[,] rephrase it so he understands the time period you're talking about[?]" Sellars then indicated that he was, indeed "very" confused by the questions. We find no error with regard to this intervention by the trial court.

{¶ 43} Next, York claims that the trial court erred with regard to objections that were sustained during defense counsel's cross-examination of Thompson. Specifically, York asked Thompson whether Sellars paid child support for R. and whether there was a period of time when he failed to exercise visitation with R. Defense counsel also asked Thompson why she did not immediately inform Sellars when she began to date York. Counsel also asked Thompson whether the vomiting episode in October was similar to the one in November. The State objected, and the trial court sustained the objections.

{¶ 44} With regard to the first three questions, York's claim of relevance is that they tend to demonstrate that Sellars had a bad temper and that he had opportunity to harm R. As stated above, Evid.R. 404 bars the evidence insofar as it relates to temperament.

Further, York does not explain, nor can we discern, how the cited questions are relevant to opportunity. With regard to the question regarding whether R.'s symptoms and appearance were similar during the October and November episodes, we agree with the State that the matter had been fully explored by defense counsel earlier in his cross-examination of Thompson. Thus, we find no abuse of discretion in the trial court's decision to sustain the State's objections.

{¶ 45} York next complains that the trial court erroneously permitted Casto to testify that the pattern injuries to R.'s scalp are consistent with marks from knuckles or a fist. He further objects to Casto's testimony that R. would not have been able to perform normally after the injuries were incurred.

{¶ 46} The admissibility of expert testimony is a matter committed to the sound discretion of the trial court, and the trial court's ruling will not be overturned absent an abuse of that discretion. *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9. We first note that expert testimony must meet the threshold of being relevant to a trial issue. Evid.R. 401. If so, then we must determine whether it is sufficiently reliable under Evid.R. 702. *State v. Abner*, 2d Dist. Montgomery No. 20661, 2006-Ohio-4510, ¶ 26. Evid.R. 702 provides that a witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the

testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

{¶ 47} During his testimony, Casto indicated that the field of forensic pathology involves evaluating the types of injury that cause death as well as determining the possible mechanisms of that injury. He further testified that he has looked at thousands of injuries. He also testified regarding his educational background as well as his training and work history. Casto testified that sometimes he is able to give an exact cause of the injury and sometimes he cannot discern the exact cause. He further testified that sometimes he is able to provide only possible causes of the injuries. In this case, he identified blunt force trauma as the cause of death. Casto testified that the circular injuries could be consistent with a blow from a hammer, but that it was not likely that a hammer was the cause of the injury as the circles were of such a uniform pattern. He testified that the pattern injuries were not inconsistent with a blow from a fist. Casto's testimony that R. would not be able to function normally after the infliction of the pattern injuries was based upon the degree of swelling found in the brain which he testified would cause a lack of oxygen to the brain. From our review of the record, we conclude that the State established that Casto's testimony was relevant and that it complied with the terms of Evid.R. 702. Thus, we cannot say that the trial court abused its discretion in permitting the cited testimony.

{¶ 48} York next claims that the trial court erroneously redacted handwriting on some of the slides presented during Ophoven's testimony before presenting the slides to the jury. In rendering its ruling, the trial court noted that the writing on the slides rendered

them suggestive and that any evidence as to what was demonstrated on the slides should be elicited through Ophoven's testimony. York does not make any argument concerning how this constitutes error, nor does he claim any prejudice resulting therefrom. Indeed, Ophoven testified at length regarding the slides. We find no error.

**{¶ 49}** York next states that "while the jury deliberated, it sent a note saying it was deadlocked on Counts I and II, and the Court, over the objection of the defense, sent a modified *Allen* charge to the jury."[3] We have reviewed the trial court's supplemental charge to the jury following their statement that they were deadlocked, and note that it comports with the charge approved by the Supreme Court of Ohio in *State v. Howard*, 42 Ohio St. 3d 18, 537 N.E.2d 188 (1989), paragraph two of the syllabus, and Section CR 429.09 of the *Ohio Jury Instructions*. *Accord State v. Howard*, 2d Dist. Montgomery No. 23795, 2011-Ohio-27, ¶ 82. York does not claim that this was error or that it caused him prejudice, and we find no error.

**{¶ 50}** Finally, York contends that the trial court expressed bias against him during sentencing with the following statement:

I am incredibly troubled by your statement because your focus was on what happened to you. And your either, inability to accept the overwhelming evidence that was presented at trial or your refusal to do so. You stated just a minute ago, I have never harmed a child. Sir, there was a lot of evidence that said that you did. But I didn't allow it in at trial because the

---

[3] In *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the United States Supreme Court set forth a summary of the supplemental instruction to be given by a trial court when jurors claimed they were deadlocked. The instructions were later modified by the Supreme Court of Ohio in *State v. Howard*, 42 Ohio St. 3d 18, 537 N.E.2d 188 (1989).

rules of evidence limit what can be presented at that trial. But your suggestion, I don't know if it's delusion or what, but sir, there was a lot of evidence of your prior conduct towards children that unfortunately on this date resulted in the horrific death of an innocent and vulnerable child.[4] You've shown no remorse at any point in time. I've watched you throughout the three years of these proceedings, and there has not been one time where I felt that you even appreciated the gravity of what occurred and the jury has determined that you did. I guess I wonder, sir, and I cannot encapsulate what [R.'s] mom and her aunt said so eloquently. But I wonder if you ever though [sic] how hard this has been for [R.'s] family, instead of merely focusing your attention on yourself.

**{¶ 51}** Just prior to this passage, York made a personal statement denying any role in the death of R. His counsel then made a statement that York would continue to "fight for his innocence in the next available venue."

**{¶ 52}** This court has stated that "it is clear that lack of remorse is an appropriate consideration for sentencing, even for a convicted defendant who maintains his innocence." *State v. Farley*, 2d Dist. Miami No. 2002-CA-2, 2002-Ohio-6192, ¶ 54. Even where, as here, the trial court must impose a mandatory sentence, rather than determining a sentence from a possible range, we cannot say that it is inappropriate for the trial court to comment upon a relevant factor. We cannot agree with York that this passage evinces bias.

---

[4] According to the Presentence Investigation Report, there is evidence that in the past York exhibited abusive behavior toward two other children.

{¶ 53} We find no errors with regard to the issues raised by York.   Also, there was ample evidence to support the conviction.   Thus, we conclude that York's claim that he was deprived of a fair trial due to cumulative error is not borne out by the record. Accordingly the sole assignment of error is overruled.

## III. Conclusion

{¶ 54} York's sole assignment of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Hilary Lerman
Hon. Mary Katherine Huffman