[Cite as *State v. Mullins*, 2019-Ohio-812.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27952 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2276 |
| | : | |
| TED A. MULLINS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of March, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JOE CLOUD, Atty. Reg. No. 0040301, 3973 Dayton-Xenia Road, Beavercreek, Ohio 45432
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the March 27, 2018 Notice of Appeal of Ted A. Mullins. Mullins appeals from the trial court's March 26, 2018 judgment entry, following a jury trial, convicting him on one count of kidnapping, with an attendant sexual motivation specification, and three counts of rape. The trial court sentenced Mullins to 11 years on each count and ordered the sentences to be served concurrently, for an aggregate term of 11 years. The prison terms on the three counts of rape were mandatory, and the court designated Mullins a Tier III sex offender. We hereby affirm the judgment of the trial court.

{¶ 2} The alleged offenses occurred on June 27, 2009. On August 2, 2017, after a DNA match connected him with the 2009 crimes, Mullins was indicted on one count kidnapping, in violation of R.C. 2905.01(A)(4), a felony of the first degree, with a sexual motivation specification, and three counts of rape, in violation of R.C. 2907.02(A)(2), also felonies of the first degree. The trial court entered pleas of not guilty on his behalf.

{¶ 3} On September 6, 2017, Mullins's counsel filed a motion to test an oral swab collected from the victim, which had indicated the presence of semen, for comparison with a DNA standard. According to the motion, a December 2, 2009 lab report on materials in the rape kit indicated that the oral swabs and a tank top " 'revealed the presence of semen,' " while the vaginal and rectal swabs " 'failed to indicate the presence of semen.' " The motion stated that Mullins's DNA had been collected and entered into an offender database in the summer of 2017, when he was placed on probation for a drug offense; after his DNA matched the DNA on the tank top of the victim in the 2009 rape, he was interviewed by law enforcement on July 26, 2017. In the motion, counsel

asserted that Mullins had "an explanation for the reasons how (and/or why) his DNA ended up on the tank top but at this point counsel is exploring the story with at least two potential witnesses before it is put on." The motion argued that a "further test could be pivotal (or admittedly further incriminating) to the defense. This has been explained to Defendant who has nevertheless agreed to the testing." The court never ruled on this motion.

**{¶ 4}** On November 7, 2017, subpoenas were issued to Miami Valley Hospital and Kettering Medical Center for Mullins's medical records from January 1, 2009, to December 31, 2009.

**{¶ 5}** Mullins's trial took place from February 12-16, 2018. The evidence presented at trial was as follows:

**{¶ 6}** The victim, L.S., testified that she and her boyfriend lived in the Plum Creek Apartments in Kettering in June 2009. She testified that on June 27, 2009, at around 12:30 or 1:00 a.m., she left her apartment to walk to a nearby Speedway, but when she reached the Speedway, it was closed. L.S. was new to the area and not very familiar with her surroundings, but she knew that there were other gas stations nearby, so she began walking south on Wilmington Pike to another store. L.S. testified that when she reached Marshall Road, she was confused about where she was, and she turned right on Marshall Road. L.S. testified that she was wearing headphones and listening to music and was irritated that a short walk had turned into what she "assume[d] would be about a half mile walk."

**{¶ 7}** L.S. testified that she saw headlights behind her but "wasn't paying attention," and "all of a sudden I have a hand over my mouth and hand under my chest

and I'm being dragged backwards." She stated that she was dragged into the back seat of a pickup truck, the door was closed, and the driver of the vehicle pulled away. L.S. testified that her attacker yelled at her to be still, got on top of her, and was "shoving me down with his hands across my throat and across my chest and he was trying to get my clothes off of me." L.S. testified that she was wearing tennis shoes, a pair of jeans with pink shorts underneath, a white tank top, and a sports bra. L.S. testified that the assailant, whom she identified as Mullins, removed her jeans and shorts, pushed her shirt and bra up, and raped her vaginally while holding her down. After that, the truck stopped while Mullins smoked a cigarette, and he told her to stay down.

{¶ 8} L.S. stated that, after Mullins finished his cigarette, the truck started moving again and Mullins "flip[ped]" her over and "start[ed] to anally rape" her. L.S. stated that she "was screaming – it was loud – and [the driver of the truck] told [Mullins] to get me to shut up and he turn[ed] the music up louder in the truck." L.S. testified that "it felt like an eternity," and that Mullins eventually stopped to smoke another cigarette. L.S. testified that she was terrified and "just wanted to get out of the truck alive." According to L.S., after Mullins finished the second cigarette, he "grabbed the back of my head and forced my head down into his crotch to give him oral" sex. She stated that she felt her hair "being ripped" from her head, and Mullins said, "if you bite me, I'll knock your teeth out." L.S. stated that Mullins ejaculated into her mouth, and his ejaculate came "[d]own the front of my mouth and into my shirt and my bra. I spit it on my shirt." She then grabbed her clothes and "popped the door open to the truck and he told me to get * * * out and he kicks me because I was taking too much time to put my clothes on."

{¶ 9} L.S. testified that, once she was out of the truck, it pulled away and she

observed for the first time that it was a gray Dodge Ram pickup with an extended cab, and that it had construction equipment and a ladder rack in the back. She testified that she "was running and I had one shoe on and * * * I looked and I saw the Speedway that I was initially going to. I was right by my house." L.S. went to the apartment of her next-door neighbor, Anthony, to call for help because she did not want to awaken her boyfriend, who had to work in a few hours. She testified, "I wasn't thinking straight. I didn't want to wake him up." Upon learning Anthony's phone was dead, L.S. testified that she went to her apartment, retrieved her boyfriend's cell phone, returned to Anthony's apartment with the cell phone, and called 911.

{¶ 10} L.S. was taken to Kettering Medical Center and a rape kit was completed. At trial, she identified her items of clothing from the rape kit. Photographs of L.S.'s injuries were admitted into evidence, including a bite mark on her chest, marks on her neck from being held down, and abrasions on her knees "from being flipped around." L.S. stated that she later "went to Kettering Medical and * * * was in their psych ward" for a couple of days after the attack. She stated she was prescribed medication to calm her nerves, and that she still had prescriptions for anxiety medication and antidepressants as a result of the attack.

{¶ 11} L.S. testified that she was contacted by law enforcement in 2017 and told that there had been a DNA match with respect to her rape kit. She testified that Detective Vince Mason texted her a photograph of a vehicle (State's Exhibit 13), and she stated that the photo depicted "a gray Dodge pickup truck with the rack that I saw the night that I was abducted" and "that I was raped in."

{¶ 12} Annette Davis testified that, at the time of the offenses, she was a DNA

analyst at the Miami Valley Regional Crime Laboratory, and the court qualified her as an expert in the fields of serology and DNA. She testified that she tested the vaginal, rectal, and oral swabs in L.S.'s rape kit for the presence of semen or seminal fluid on September 28, 2009. The oral swabs revealed "a weak positive on the acid phosphatase test which is the presumptive test." She testified that a "microscopic test" was "negative," but she followed up with a specific antigen test which produced "a weak positive result," indicating "the presence of semen." Davis testified that the vaginal and anal samples were negative and were not retained. The oral swabs were retained because of the "positive identification for semen." Davis stated that she also retained the swabs from L.S.'s right breast and between her breasts, which "had mixed DNA profiles * * * that included the victim." She stated that "the dried swabs between the breasts look[ed] to be a fairly full profile." Davis testified that the retained swabs were kept "in a small envelope in the freezer at the laboratory." Davis testified that she also subsequently received and tested the tank top. She stated that she obtained a strong sample of semen from the tank top, from which she developed a full DNA profile that she entered into the DNA database.

{¶ 13} Detective Vince Mason testified that he interviewed Mullins after his arrest and advised Mullins that he was investigating a sexual assault case in which Mullins's DNA came back as a match. In reply, Mullins stated that he did not know anything about it, and when shown two pictures of L.S., said "he didn't know who she was." Mason testified that he told Mullins the date and time of the assault, and that the victim had reported spitting ejaculate onto her shirt. Mason described the vehicle used in the incident, and Mullins stated that he "never owned a truck like that."

{¶ 14} Amy Dallaire, a forensic scientist in the serology and DNA section of the

Miami Valley Regional Crime Laboratory, was qualified as an expert in the fields of serology and DNA. Dallaire testified that, in July 2017, she learned that Mullins had been identified in the DNA database. She subsequently received a "known standard" for Mullins from the Kettering Police Department and was able to develop a DNA profile therefrom. Dallaire stated that she compared her DNA profile to the profile Davis had developed in 2009 from the tank top. Dallaire testified that to "a reasonable degree of scientific certainty, Ted Mullins is the source of the male DNA on the tank top." Dallaire testified that she also compared Mullins's profile to two dried stains that had been previously profiled by Davis, and performed DNA analysis on the oral swabs that had been retained at the laboratory. Dallaire testified that she "found no DNA foreign to [L.S.] on the oral swabs." With respect to the dried stain from L.S.'s right breast, Dallaire concluded that Mullins could not be excluded as a possible contributor. Dallaire explained that "when you can't say something cannot be excluded, [it] means it's a mixed DNA profile." She further testified, "in this case also you get a mixed profile because you are swabbing someone's body, so you expect at least one DNA person [sic] to be there. So I look at my mixture, and then look at his standard. I can see his DNA types in the mixture, so that's why he cannot be excluded." According to Dallaire, in "this case my stat is 1 in 97,000, that someone else could also be a possible contributor to the mixed DNA profile." Regarding the dry stain from between L.S.'s breasts, Dallaire testified that Mullins also could not be excluded as a possible contributor to the mixture obtained from that stain. She stated that in "this case it's 1 in 47 million that someone else could be a possible contributor to this mixed profile obtained from that dried stain."

{¶ 15} When asked why Davis was able to detect the presence of semen on the

oral swabs in 2009, and she was not, Dallaire testified as follows:

It could be - - I mean, you've got to kind of think of like the oral cavity. I know you're constantly, you know, making saliva, you're constantly swallowing, I know, or maybe she, you know, spit, you know, semen out, so that kind of leaves not as much in there for us to detect for DNA purposes. You know, if she had something to drink or brush[ed] her teeth, that kind of would take away the chance of me getting a DNA profile from those oral swabs.

So it's not uncommon to be able to detect semen, there's probably very little there, but then when I actually go do the DNA analysis, the (indiscernible) so much of her kind of mask any little bit of semen that might be there, so I can't detect it.

{¶ 16} In addition to the above witnesses, the State's evidence included the testimony of Kettering Police Officer Jeffrey Geckler, who was dispatched around 5:00 a.m. to L.S.'s apartment after the rape. Anthony, L.S.'s next-door neighbor, also testified that L.S. came to his apartment around 4:30-4:45 a.m. and reported the rape. L.S.'s boyfriend testified that he went to bed on the evening of June 26, 2009, and was awakened by the police between 4:00 and 5:00 a.m. the following morning; they advised him that L.S. had been sexually assaulted. Renee Smith, the Kettering Medical Center nurse who completed L.S.'s rape kit on June 27, 2009, testified that L.S. arrived at the hospital at 5:35 a.m. Dr. Richard Harover testified that he was the staff emergency room physician who treated L.S. at Kettering Medical Center. Former Kettering Police Officer Paul Markowski testified that he was dispatched to Kettering Medical Center on the report

of L.S.'s rape. Finally, Elizabeth Diem testified that, in 2009, she was a physician's assistant at the emergency room at Kettering Medical Center, and that she treated L.S. on June 29, 2009, for "major depression and anxiety status post-rape."

{¶ 17}  A friend of Mullins's, Alonna, testified for the defense.  She stated that she had been friends with Mullins for 22 years and that they dated "off and on."  She testified that she had never known Mullins to be violent.

{¶ 18} Mullins also testified on his own behalf.  He testified that he was 47 years old and did exterior remodeling for a living.  In "[a]pproximately 2007," he "fell 40 feet straight to the ground off of a ladder" and, as a result, his right femur "was totally dislocated, and my leg was totally basically turned around backwards," and his "collarbone was separated."  Mullins stated that he "got a metal plate in my femur, pins, bolts, and screws, all down my right side and it's constantly like in pain and so forth."  He stated that he was unable to raise his left arm all the way.  Mullins stated that at the time of the injury, he "still ran the company, but I didn't work myself.  I still had employees working for me.  I still subbed out some work."

{¶ 19} The following exchange occurred:

Q (Defense Counsel). * * * Was there a point at which you were able to - - what kind of medical intervention occurred with the injury? * * *

A (Mullins).   A walker and a wheelchair both.

Q.   And how long did that last?

A.   About a year and a half.

Q.   * * * You said this injury was 2007?

A.   Correct.

Q. * * * what part of 2007 did this occur?

A. It would have been late 2007, somewhere approximately around August, September.

Q. Of 2007?

A. Correct.

{¶ 20} Mullins testified that on the evening of June 26, 2009, he "was at Sure Shots Lounge on East Dorothy Lane in Kettering at a pool tournament." He stated that a friend, Robert, picked him up around 8:30 p.m. in a 2000 black Dodge extended cab pickup truck to go to the tournament, and that they also picked up another friend, T.J. Mullins testified that the truck had three doors, two up front and one on the back passenger side of the vehicle. He stated that to open the rear door, "you have to open the passenger door first." Mullins testified that there was "very little leg space" in the backseat area.

{¶ 21} Mullins further stated that he did not have anything to drink that night because he was the designated driver of the group, and that they left the bar at about 12:30 a.m. Mullins stated that, when the group left the bar, he took West Dorothy Lane to Wilmington Pike and turned left to head south. He stated that Robert was in the front passenger seat and T.J. was in the backseat. As they approached the intersection of Wilmington Pike and Marshall Road, they observed "a young lady," whom he later identified as L.S., on the right side of the road "being forcefully pulled by another man * * * down the sidewalk to the right of Wilmington Pike heading back * * * northbound on Wilmington." Mullins testified that he "heard the screaming, and she was hollering, 'Help,' " so he stopped, turned right, came to a stop, and "we hollered out the window and asked what was going on * * *." Mullins testified that the man "just kept pulling [L.S.] by

the hair." Mullins stated that the man then let go of L.S.'s hair, and as Robert and T.J. got out of the truck and approached them, L.S. ran to the truck and climbed inside the passenger front door. Mullins testified that the man who was pulling L.S. by the hair yelled, "You can have her; she ain't nothing but a dope whore." Mullins stated that his companions returned to the truck, T.J. got into the backseat, and the other man began walking away in the opposite direction.

{¶ 22} Mullins testified that L.S. was upset and identified her assailant as "her so-called boyfriend." According to Mullins, L.S. stated she and her boyfriend were having a fight, that she had started to go next door to the neighbor's house when her boyfriend went to sleep, but the boyfriend got up, walked out, had words with L.S. because she was next door, and then they went back to the apartment. Thereafter, L.S. left the apartment on her own, and her boyfriend chased after her. Mullins testified that L.S. told him she did not want to return to her apartment. He testified that he "noticed that [her assailant] had come back out and started hollering for her because she had a phone on her, and he started hollering, said, 'Hey, she's got my phone.' " About that time, "she's like go or whatever," and Robert went to get into the truck and told L.S. to get in the back of the truck.

{¶ 23} According to Mullins, L.S. "didn't know what she wanted to do, so I chose and drove around the block. I drove around the block looking for the gentleman." Mullins testified that L.S. told him she wanted to "make a couple calls to find out if she could go somewhere else so she could find somewhere to go." He testified that they proceeded to his efficiency apartment on South Dixie in Moraine.

{¶ 24} Mullins testified that Robert's girlfriend arrived at the apartment at the same

time as the group in the truck. He testified that L.S. "sat in the first chair by the door," and that Robert's girlfriend began talking to her. Mullins testified that, at the time, he was romantically involved with a woman named Leah; he and Leah did not live together, but she often stayed at his apartment and kept personal items there. Mullins testified that after Robert's girlfriend, Vicki, spoke to L.S., Vicki and Robert left the apartment. Mullins testified that "the next thing" he knew, his friends Dustin and Jennifer brought home Mullin's best friend, Shane, who lived next door to Mullins; Shane entered his own apartment next door, but Dustin and Jennifer entered Mullins's apartment. Mullins testified that, at this point, L.S. got up from the chair and asked to use the bathroom. Mullins testified that she entered his bathroom, where she "was supposed to be cleaning up. I made sure she had a rag on the sink when she went in," because she had "been crying, been pretty hysterical." Mullins testified that L.S.'s "face was teared up," that her "hair was messed up or whatever where she'd been pulled on," and that she "looked like she was a little rough like she had been in a battle."

{¶ 25} Mullins testified that L.S. had been wearing "a white blouse with short sleeves and a pair of jeans" and that the "white blouse was ripped off of her halfway down." He stated that it was ripped "[f]rom the neck down" and that he could see a sports bra underneath it. Mullins testified that, after about 10 minutes, Jennifer needed to use the restroom, knocked on the door, and did not get a response. Mullins also "ended up knocking on the door really loud and pounded on it [a] couple times, didn't get no response at all so I kicked it open. It only had a little slide lock on it. It only took a little push."

{¶ 26} According to Mullins, "L.S. was sitting on the toilet and had a needle in her hand and had her pants off and had pink shorts on, and had her shirt laying on the ground,

and had picked up a tank top that was laying in the bathroom and put this little white tank top on of my girlfriend[']s." Mullins testified that he and his girlfriend had engaged in oral sex around the time of June 27, 2009. Mullins "hollered at [L.S.] because she was kind of nodding. She wasn't like totally there"; he "made sure she was alive," because "she must have been pretty high 'cause she must have just did a shot." Mullins stated that he "got pretty hysterical, told her she needed to get up and go, it was time to go." He also "told [her] that she was supposed to been in there making phone calls." Mullins "asked her if she found anywhere to go or whatever and if she needed a ride and so forth, I would take her." Mullins testified that L.S. ended up going back to sit in the living room, and he took the shirt and the needle to the dumpster and threw them away.

{¶ 27} Mullins testified that, when he returned to the apartment, Jennifer was in the bathroom, and Dustin was speaking to L.S. Mullins testified that he again asked L.S. "if she had figured out anything yet, what she wanted to do." In response, L.S. "started crying a little bit" and said, "No, I don't know what to do, I have nowhere, all I got is [my boyfriend]." Mullins told her that she could not stay at his apartment and, "I don't go for needles."

{¶ 28} Mullins testified that Shane then came over to his apartment, and Mullins asked Shane if he had " 'time to ride me back to Kettering, drop this girl off.' " Mullins testified that, at the time, he owned a 1997 burgundy and tan Ford F-150 standard cab pickup truck that he used in his employment; it had a "[f]ull ladder rack, full ladders, equipment, walk boards, pump jack, full construction material." When shown Exhibit 13, Mullins denied that the truck in the photograph was his, stating, "they're two totally opposite trucks, but the ladder rack would be the only thing similar."

**{¶ 29}** Mullins testified that he, Shane, and L.S. got into his truck, with L.S. in the middle and Shane by the passenger door, and they drove back to the Speedway behind her apartment, because that was where L.S. wanted to be dropped off. Mullins testified that he gave L.S. his business card and told her to call him if she needed anything or had any problems.

**{¶ 30}** Mullins testified as follows:

I said, "Look, if I was you I wouldn't go back there." She said, "I have nowhere to go." I said, "I don't have time to deal with this. I can't be * * * I don't go for that, man." I said, "I'm sorry, but I just - - I don't go for that and I can't do it," and I said, "I'm not getting in the middle of it, I just - - I got things going on, you know, I got work things, I got so forth to do. I ain't got time for you to be at the apartment I'm - - you know, I work in the morning."

Mullins testified that L.S. proceeded to her apartment, and that was "the very last time I saw her."

**{¶ 31}** Mullins testified that he was contacted by Detective Mason in the summer of 2017, was eventually arrested, and agreed to a DNA swab. Mullins denied raping L.S.

**{¶ 32}** Mullins testified that, while incarcerated, he used the jail telephone, knowing that all the calls were recorded.

**{¶ 33}** On cross examination, the following exchange occurred:

Q (Prosecutor). * * * And you do construction work?

A (Mullins). Yes, I do.

* * *

Q. And you fell doing that work?

A.   Yes, I did.

Q.   * * * And that was in 2007, and you indicated I think that there was 18 months of rehab that you did?

A.   Approximately, yes.

Q.   Okay, so that would be a lot of medical records that would have been produced during that time, correct?

A.   Possibly, not really.   I went - - actually, the first year I went on the walker by myself and so forth and didn't go back hardly.   Then I got hurt again and injured and I went back into the wheelchair.

Q.   You talked about screws in your leg and - -

* * *

Q.   - - something in your shoulder?

A.   Uh-huh, I got pins, plates, bolts and screws all down my right side.

Q.   There would be medical records for - -

* * *

A. - - medical records for everything.

Q.   With dates on them?

A.   Yes. * * *

* * *

Q.   You would agree we don't have any of those medical records here.

A.   Not that I know of.

{¶ 34} Mullins testified that the truck pictured in Exhibit 13 was the truck he was in on the night of June 26, 2009 with Robert and T.J., and that it belonged to Robert's employer, Pete. Mullins testified that the ladder rack depicted in the photo was not on the truck in 2009. He testified that he and Robert used to "subcontract" for Pete's construction company, and that Robert worked for Pete full time after Mullins was injured. Mullins testified that Robert had borrowed the truck from Pete, that L.S. was in the truck on June 26, 2009, and that he was not surprised that L.S. could describe it. He testified that he did not call the police for L.S. because she did not appear to be "physically hurt," and that the situation appeared "like more of an argument between a boyfriend and girlfriend." Mullins asked L.S. if she wanted him to call the police for her, but "she said no, she would not prefer that." He testified that L.S. did not want him to pull into the parking lot at her apartment because she did not want her boyfriend to see her.

{¶ 35} The following exchange occurred during cross examination regarding the alleged witnesses to L.S.'s presence in Mullins's apartment:

Q (Prosecutor). Okay, so six people total that were there this night?

A (Mullins). Yes.

Q. Six people total that would have seen [L.S.] - -

* * *

Q. - - at your apartment.

A. That's is [sic] totally correct. Yes.

Q. * * * Including [Robert]?

A. That's correct. Yes.

Q. In fact, he would have seen this whole incident with [the

boyfriend] where she's being dragged up the side of the street.

A. Where she's being pulled up the street. Yes.

Q. As would T.J.

A. Yes, that would be correct.

Q. And they would remember something like that because it's pretty dramatic.

A. I don't know about that. I didn't remember it either.

Q. * * * You agree with me that's a pretty dramatic scene to see a woman being dragged - -

A. Yeah - -

Q. - - up the street.

A. - - but if it doesn't involve you and it's nine years later, it's kind of hard to say, hey nine years ago do you remember this. Do you remember nine years ago? No, not exactly.

Q. I'm asking you if somebody asked you about that incident - -

A. No, I did not.

Q. - - and said - -

A. Nine years ago I did not. At that time, no.

Q. * * * If somebody asked you specifically do you remember this incident where you saw a woman being dragged up the street, that's probably something you would remember, correct?

A. I did after a time - - after I had time to think about it. Yes, I did.

{¶ 36} Mullins testified that when his neighbor, Shane, got dropped off, it was

about 1:30 a.m. Mullins also testified that the tank top that belonged to his girlfriend and that L.S. wore home was covered with his ejaculate.   When asked if he agreed that "the science in this case that led us to you is correct," Mullins responded, "That's totally correct."   He testified that his girlfriend's tank top had been in his bathroom from "about a half hour before I went to the pool tournament."   Mullins testified that the hoodie he gave L.S. had his company logo on it and "Mullins Exteriors."   Mullins stated that he disagreed with the State's evidence regarding the time of L.S.'s return to her apartment, and that according to his version of events, two or three hours elapsed after her return before she called the police.

{¶ 37} Mullins acknowledged that he talked about his pending case on the jail telephone.   He acknowledged that it was "a possibility" that he may have indicated in the recorded calls that he was the passenger in the truck, and that Robert was driving. Mullins testified that any statement by him that Robert was driving Pete's truck was incorrect because "I drove that vehicle."   Mullins denied stating in a jail phone call that, when he initially observed L.S., she was wearing a tank top. Mullins testified that he was "pretty sure" that he mentioned T.J. being present on the night of the attack in the phone calls.

{¶ 38} Detective Mason testified on rebuttal regarding Mullins's recorded conversations.   Mason testified that he had listened to all of Mullins's recorded calls from the Montgomery County Jail, as well as recordings of Mullins's visitations.   A call between Mullins and Alonna from August 18, 2017, was played for the jury. Mason testified that it was an accurate recording of the call, and that Mullins indicated therein that L.S. was wearing a white tank top when he first saw her.

{¶ 39} The following exchange occurred:

Q (Prosecutor).   * * * On a similar note, have you heard a version where TJ was in the car prior to today?

A (Mason).   I've listened to several calls.   I've never heard the name TJ at all until today.

Q.   * * * You heard the defendant's testimony today that he was the driver, [Robert] was the passenger, correct?

A.   Yes, I heard that today.

Q.   Is that consistent with his version as described in these recorded calls?

A.   No.   The version I heard in the calls was [Robert] was driving, and then I had to listen to a different call to figure out who [Robert] was.

Q.   * * * And does he ever change - - in the calls that you listened to, does he ever change from [Robert] was driving and I was the passenger?

A.   No, not in the calls I heard.

Q.   How many times do you think he told this story?

A.   Where he's actually talking about the truck and [Robert], I heard him tell his brother * * * a little bit about the truck and [Robert], talked to his mom a little bit about it, and Alonna more than anybody about it.

Q.   * * * And in any version that you heard was he the driver?

A.   I never heard that till today.

Q.   Till this moment he agreed he was the passenger, correct?

A.   Yes, ma'am.

Q.   And until this moment he agreed that [L.S.] was wearing a tank top the night that she got in his truck.

A.   That's what I'd always heard.   Yes.

**{¶ 40}** On cross examination, the following exchange occurred:

Q (Defense Counsel).   Detective, you mentioned that at some point in time you got a hold of [Robert]?

A (Mason).   Yes, sir, I talked to [Robert]

Q.   * * * And he admitted to knowing [Mullins] back in 2009?

A.   Yes. * * *

Q.   But he couldn't offer any recollection of what happened that night, said he couldn't remember anything?

A.   Couldn't remember nothing, he said he used to drink a lot.   He doesn't remember anything back then.

**{¶ 41}** During its deliberations, the jury submitted multiple written questions to the court.   The initial question, marked as Court's Exhibit 2, submitted after two hours of deliberations, was: "Yellow pages from sex assault kit are not in box; can we see them?" The prosecutor and defense counsel agreed that the pages were not admitted into evidence, and the court so advised the jury.   Twenty-five minutes later, the jury submitted a second question, marked as Court's Exhibit 3: "Judge, if we find him not guilty of kidnapping, is other three counts null and void?"   With the agreement of counsel, the court directed the jurors' attention to the jury instructions, specifically page 8, line 16 through 19, which provided as follows as read by the court:

Each charge set forth in the counts in the indictment constitutes

individual, separate, and distinct matters. You must consider each count and the evidence applicable to each count separately and you must state your findings as to each count uninfluenced by your verdict as to the other count[s]. Ted Mullins may be found guilty or not guilty on any offense or offenses charged.

{¶ 42} Subsequently, the jury submitted a request, marked as Court's Exhibit 4, as follows: "We can come to an agreeable decision on all counts. We ask that we be allowed to go home for rest and return Friday at 9:00 a.m. for continued deliberations." The court excused the jury for the evening.

{¶ 43} The next day, the following exchange occurred in the course of deliberations:

THE COURT: * * * So we're in chambers, counsel and Court, it's ten minutes to noon, and the Court received the note[1] which I just showed to the counsel off the record, and the note says, "To Judge, misspelling of my name, Langer - - it says, "We, all 12 jurors agree that we cannot come to an agreement on any of the counts we were charged with. Signed Mr. [M.], the foreman.

And so, * * * what is the request of the State?

[PROSECUTOR]: Your Honor, the State would request that the Court give and instruct the jury with regard to the *Allen* charge.

[DEFENSE COUNSEL]: And the defense would object.

THE COURT: * * * Second District Court of Appeals, and actually

---

[1] The note was marked as Court's Exhibit 5.

there's a decision that literally was filed today, February 16th, *State v. York*, Montgomery (indiscernible) No. [27521], and at paragraph 49 it dealt with a claimed error by the defendant that after the jury said it was deadlocked on Counts I and II, over the objections of the defense, the Court gave the jury the modified *Allen* charge and the Court of Appeals at paragraph 49 states, "We have reviewed the trial court's supplemental charge to the jury following their statement they were deadlocked, and * * * note that it comports with the charge approved by the Supreme Court of Ohio."

So this is entirely an appropriate situation where the Court will give the modified *Allen* charge*.*

* * *

* * * [B]ut other than your objection to giving this at all, * * * do you object to the substance of this so-called * * * modified *Allen* charge?

[DEFENSE COUNSEL]:   No.

**{¶ 44}**  The court subsequently instructed the jury as follows:

Now, I'm going to have the bailiff give to each of you a copy of this supplemental instruction that you can read along with the Court and I've marked this supplemental instruction as Court Exhibit 6.

* * *

"Members of the jury, the principal mode provided by our Constitution and laws for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected.

"Although the verdict must reflect the verdicts of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others.

"You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe that the case will ever be submitted to a jury more capable, impartial, or intelligent than this one.

"Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous.

"If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict, or verdicts, have not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath.

"Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors."

So with that and you'll take with you the supplemental instruction, I'll

ask you to return to the jury room to resume your deliberations.

**{¶ 45}** The jury subsequently found Mullins guilty of all four counts.

**{¶ 46}** Mullins asserts two assignments of error on appeal. His first assignment of error is as follows:

THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL IN VIOLATION OF [THE] FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶ 47}** Mullins asserts that defense counsel was ineffective in: 1) failing to object or pursue the trial court's failure to rule on prior defense counsel's motion for a DNA test of the oral swabs, filed on 9/6/2017; 2) failing to utilize an independent DNA forensic expert on behalf of the defendant; 3) failing to present medical records from Miami Valley Hospital or Kettering Medical Center to support the defendant's testimony at trial that he would have been physically unable to abduct and rape the victim on June 27, 2009; 4) failing to present any supporting and corroborative testimony from at least one witness out of a possible six eyewitnesses who could have supported the defendant's testimony at trial; and 5) failing to object to the trial court's "manipulation" of the jurors by not instructing them with a written charge that they had the right to maintain their decision evidenced by Court's Exhibit 5, the note stating that they were deadlocked.

**{¶ 48}** This Court has previously noted:

* * * To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective

standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989).

Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688. A defendant is entitled to "reasonable competence" from his or her attorney, not "perfect advocacy." *See Maryland v. Kulbicki*, 136 S.Ct. 2, 5 (2015), citing *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.).

*State v. Martin*, 2d Dist. Montgomery No. 27844, 2018-Ohio-3505, ¶ 14-15.

<u>Motion for DNA Testing</u>

**{¶ 49}** Mullins asserts that the record does not reflect any ruling by the trial court on his first trial counsel's motion for a DNA test. Therefore, he asserts, there was "no *potential* exculpatory evidence garnered by the defendant's trial counsel to refute the State's DNA evidence." (Emphasis added.)

**{¶ 50}** Annette Davis testified that she detected a "weak positive" result for the

presence of semen on the oral swabs on the acid phosphatase test and the specific antigen test, and a negative result on the microscopic test. Based upon her results, she retained the oral swab samples. Amy Dallaire subsequently performed DNA analysis on the oral swabs and found no DNA foreign to L.S. She explained that the nature of the oral cavity, in which saliva is constantly produced and swallowed, reduces the ability to detect foreign DNA, and that the fact that L.S. "spit * * * semen out" reduced any detectible amount. She further testified that L.S.'s own DNA masked "any little bit of semen that might be there." Given the inconsistent results regarding the presence of semen on the oral swabs, and Dallaire's explanation regarding the inherent difficulty of detecting semen in the oral cavity, we conclude that Mullins's argument herein regarding the presence of "*potential* exculpatory evidence" sufficient to refute the State's significant evidence of guilt is merely speculative. In other words, we cannot conclude that, had defense counsel pursued further DNA testing of the oral swabs, there was a reasonable probability that Mullins would have been acquitted. Prejudice is not established, hence ineffective assistance of counsel is not demonstrated.

### Independent Expert Witness

{¶ 51} According to Mullins, a "defense DNA expert *might* have been able to cast some doubt on the State's DNA evidence" if an independent forensic analysis had been conducted on the oral swabs and any other evidentiary items from the rape kit used by the State at trial. (Emphasis added).

{¶ 52} " 'As an initial matter, the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.' *State v. Nicholas* (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225, citing *State v. Thompson* (1987), 33

Ohio St.3d 1, 10-11,514 N.E.2d 407." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 66.   Mullins's assertion that a defense DNA expert "*might*" have impeached the expert testimony of Davis and Dallaire is again merely speculative. Mullins does not identify the expert that defense counsel allegedly should have called or what the witness would have said. *See id.*   As in *Hunter*, we conclude that "trial counsel's decision to rely on cross-examination appears to have been a legitimate 'tactical decision.' "   *Id.,* citing *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 97.   Significantly, Mullins acknowledged it was his semen on the tank top, attributing it to fellatio with his girlfriend. We accordingly cannot conclude that, had defense counsel called a DNA expert on Mullins's behalf, the outcome of the trial would likely have been different.

## Medical Records

{¶ 53} Mullins asserts that during the period of January 1 to December 31, 2009, which includes the date on which L.S. "testified that she was violently abducted and brutally raped," he was suffering from "very serious injuries from a fall off a roof at work." He asserts that "his medical records would have corroborated and supported his testimony about his physical disability," and that defense counsel should have introduced those records.   Mullins notes that the State pointed out the defendant's failure to produce these medical records.

{¶ 54} Again, we conclude that Mullins's argument is speculative.   Mullins testified that his injury occurred in August or September 2007, almost two years before the attack on L.S.   He further testified that the injury lasted about a year and a half, and we note that a year and a half from August or September 2007 would have been February

or March 2009, over three months before L.S. was attacked. We further note that Mullins's testimony was inconsistent: on direct examination, he testified that he received medical intervention in the form of a walker and a wheelchair, yet on cross-examination, he testified that there might "[p]ossibly, not really" be many medical records documenting the injury because during "the first year I went on the walker by myself and so forth and *didn't go back hardly.*" (Emphasis added.) In light of this testimony, it is conceivable that the 2009 records subpoenaed by defense counsel (if there were any) to establish that Mullins was still receiving care from his injuries would not have supported Mullins's claim of physical disability for that time period. Mullins also testified that, during the relevant timeframe, he drove a pickup truck to a pool tournament and kicked in the bathroom door at his apartment, and his testimony further suggests that he was engaged in exterior remodeling work at this time. Mullins further testified that he repeatedly told L.S. that he had "things going on, * * * I got work things, I got so forth to do. * * * I work in the morning." The jury could have reasonably concluded that exterior remodeling work was physical in nature and was inconsistent with Mullins's claims of physical disability at the relevant time. Again, given the significant evidence of Mullins's guilt, we cannot conclude that defense counsel's introduction of the alleged medical records would have altered the outcome of the trial. In other words, ineffective assistance of counsel is not established.

Failure to Call Witnesses

{¶ 55} Mullins asserts that there were six witnesses who were at his apartment when L.S. was allegedly there, and that they "would have in all reasonable probability" added "credibility and truthfulness" to his testimony about the events of that evening. According to Mullins, "defense counsel offered no explanation whatsoever to the jury for

the lack of appearance for these individuals," and the State brought this to the attention of the jury, which "had a substantial impact on [its] deliberations and subsequent questions to the court." Mullins asserts that it was "readily apparent they were judging the defendant's credibility with regard to his physical ability to abduct and physically assault the victim."

{¶ 56} As this Court has previously noted:

The failure to call an available witness whose testimony could acquit the defendant can constitute ineffective assistance of counsel. Nevertheless, there is a presumption that any challenged action on the part of defense counsel "might be considered sound trial strategy." Decisions regarding the calling of witnesses will often fall within the range of acceptably sound trial strategy.

*State v. Jenkins*, 2d Dist. Miami No. 2002-CA-1, 2003-Ohio-4428, ¶ 7, citing *State v. Johnson,* 2d Dist. Montgomery No. 16803, 1998 WL 453768 (Aug. 7, 1998).

{¶ 57} We note that Robert and Dustin were the only two of the six alleged witnesses to L.S.'s presence in Mullins's apartment who were included on his witness list, which was filed less than a week before trial. Detective Mason testified that Robert told him he did not remember the incident. T.J. was the only other alleged witness who could have corroborated Mullins's testimony that he observed L.S. being dragged up the street by her boyfriend. Mason, however, testified that Mullins never mentioned T.J. in all of his recorded conversations, and we note L.S. did not testify to the presence of a third occupant in the pickup truck, suggesting that T.J. was not present in the truck with Mullins. It is entirely speculative as to the availability of these absent witnesses and also whether

they could have provided favorable testimony. Ostensibly, counsel chose not to call them as a matter of sound trial strategy. We further note that Mullins acknowledged that "it's kind of hard to say" if the other witnesses would remember the incident, and that he himself did not initially remember it (but then subsequently provided an extremely detailed account of his version of events at trial). Finally, we cannot conclude that the exchange during Mullins's cross examination about the lack of defense witnesses "had a substantial impact" on deliberations. Given the evidence of Mullins's guilt, we have no reason to conclude that he would have been acquitted if the alleged witnesses had been called. No prejudice having been established, ineffective assistance is not demonstrated.

## Jury Instruction

We note that Mullins does not make any argument in his first assignment of error regarding defense counsel's failure to request that the court provide the jurors "with a written charge that they had the right to maintain their decision evidenced by the Court's Exhibit 5," beyond this assertion. In his second assignment of error, however, Mullins argues that defense counsel "only made a general objection to the Allen Charge and made no effort to argue Court's Exhibit 5 was a final verdict." For the reasons discussed in detail in Mullins's second assignment of error, we conclude that the trial court properly encouraged the jury to reach a verdict upon receipt of Court's Exhibit 5; accordingly, any request by defense counsel for an instruction that the jury had "the right to maintain [its] decision as evidenced by the Court's Exhibit 5" would not have altered the outcome of the trial. Ineffective assistance of counsel is not demonstrated in counsel's failure to request such an instruction.

{¶ 58} Mullins's first assignment of error is overruled in its entirety.

**{¶ 59}** Mullins's second assignment of error is as follows:

THE TRIAL COURT COMMITTED PLAIN ERROR AND VIOLATED

THE DEFENDANT'S RIGHT TO A FAIR TRIAL.

**{¶ 60}** Mullins argues that the "trial court manipulated the jury by forcing [it] into a guilty or not guilty verdict," and that the error was not harmless as it prejudiced the jurors against him, denied him a fair trial, and created a miscarriage of justice. He asserts that the court should have instructed the jury as follows: "[I]f you decide that you cannot unanimously agree, and that further deliberations will not serve a useful purpose, you may ask to be returned to the courtroom and report that fact to the Court." According to Mullins, had the court so instructed the jury, "the jury's confidence in not being able to reach a verdict would not have been undermined, and the outcome of the trial may have been totally different." Mullins argues that the "Allen Charge standing alone did not sufficiently inform the jury of [its] right to remain deadlock[ed]," and the trial court committed plain error by instructing the jury "with just the Allen Charge only and not providing additional instruction that [the jury] had the right to maintain the decision evidenced by Court's Exhibit 5."

**{¶ 61}** The State responds that "not only did the trial court not abuse its discretion in giving the charge, but it was correctly provided."

**{¶ 62}** The trial court relied on *State v. York*, 2018-Ohio-612, 107 N.E.3d 672, fn. 3 (2d Dist.), in instructing the jury. In that case, this court observed that, in "*Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L.Ed. 528 (1896), the United States Supreme Court set forth a summary of the supplemental instruction to be given by a trial court when jurors claimed they were deadlocked. The instructions were later modified

by the Supreme Court of Ohio in *State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989)." As in *York*, we have reviewed the trial court's supplemental charge to the jury following its statement that it was deadlocked, and we note that it comports with the charge approved by the Supreme Court of Ohio in *Howard* at paragraph two of the syllabus, and with *Ohio Jury Instructions,* CR Section 429.09(2). *See York* at ¶ 49.

**{¶ 63}** *Ohio Jury Instructions,* CR Section 429.09(3), in contrast, is consistent with the instruction to which Mullins asserts he was entitled. It provides as follows:

It is conceivable that after a reasonable length of time honest differences of opinion on the evidence may prevent an agreement upon a verdict. When that condition exists you may consider whether further deliberations will serve a useful purpose. If you decide that you cannot agree and that further deliberations will not serve a useful purpose you may ask to be returned to the courtroom and report that fact to the court. If there is a possibility of reaching a verdict you should continue your deliberations.[2]

**{¶ 64}** As noted above, Mullins objected to the *Howard* instruction. " 'Jury instructions are within the trial court's discretion. Accordingly, a trial court's decision whether to give a *Howard* instruction is within its discretion, and this court will not reverse that decision absent an abuse of discretion.' " *State v. Howard*, 2d Dist. Montgomery No. 23795, 2011-Ohio-27, ¶ 63, quoting *State v. Lightner*, 3d Dist. Hardin No. 6-09-02, 2009-Ohio-4443, ¶ 11. As this Court has previously noted:

* * * An abuse of discretion implies that the trial court's attitude was

---

[2] This is the "*Martens*" instruction. *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993).

unreasonable, arbitrary, or unconscionable. (Citation omitted.) *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 598 (1990). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

*State v. Myers*, 2d Dist. Clark No. 2015-CA-88, 2016-Ohio-4893, ¶ 13. We see no abuse of discretion.

**{¶ 65}** As this Court noted in *Howard* at ¶ 82: "* * * The trial court was entitled to encourage the jury to make continued efforts to reach a verdict, if the jury could conscientiously do so. *Howard*, 42 Ohio St.3d at 25. * * * The court did not coerce the jury to reach a verdict or mislead the jury with its supplemental instruction." On this record, the court did not err by failing to give the *Martens* instruction as well.

**{¶ 66}** For the foregoing reasons, Mullins's second assignment of error lacks merit, and it is overruled.

**{¶ 67}** Having overruled Mullins's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Jans
Joe Cloud
Hon. Dennis J. Langer